HORLICK'S FOOD CO. v. ELGIN MILKINE CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 6, 1903.)

No. 896.

**1. TRADE-NAMES—TERMINATION OF EXCLUSIVE RIGHT TO USE—EXPIRATION OF PATENT.**

Where the manufacturer of an article, to which he gave a name, by which it became known, placed upon the packages in which it was sold to the public a notice in the usual form that the article was made under a patent, the right to the exclusive use of the name as a trade-name expires with the expiration of the patent, whether the article was in fact made in accordance with the patent or not.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

Charles Quarles and Frank F. Reed, for appellant.

F. C. Winkler and E. H. Bottum, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

GROSSCUP, Circuit Judge. This is a suit brought by appellant, a citizen of the State of Wisconsin, against appellees, citizens of the State of Illinois, to restrain fraudulent competition charged to be perpetrated in the use, by appellees, of the words "Malted milk" in the preparation and sale of their products.

The case is not free from contradictory testimony; but in the view we have taken, that portion which is material, may be assumed as substantially stated by appellant.

In 1887, the appellant began the manufacture at Racine, Wisconsin, of a dry granulated or powdered extract of malt, flour and milk, to which it gave the name of "Malted milk." At this time, as appellant claims, it was not known that malt acted upon milk chemically, and the name "Malted milk" was, unless fanciful, suggestive only of the two ingredients entering into the product.

Appellant's business has been, and is, very profitable. More than $200,000 has been invested in its plant, and over $250,000 expended annually in advertising. The product was known, the world over, as "Malted milk." Its trade name, and the name by which it has been known in medical and other literature, has been simply "Malted milk"; so that the product has come to be bought and sold by that name.

In the year 1897, the appellee corporation was organized, and began to manufacture, sell and advertise a granulated milk food, as malted milk; claiming in its circulars, that this product was better than appellant's malted milk. No action was taken by appellant, however, until 1901, when appellees began putting upon the market a powdered extract of malt, flour and milk, to all appearances identical with appellant's product, and called it "Meadows Malted Milk." The packages used by appellees are dissimilar in shape and in color of ink, from those of appellant, but the words "Malted milk" are conspicuously employed.

The contention of appellant is, that the words "Malted milk" had, at the time they were adopted as the name of appellant's product, no known significance; that they were not descriptive, for it was not then known that milk could be malted; but they have come to describe the product solely through the exploitation of the product by appellant; and that, under such circumstances, the term has become, exclusively, within the right of appellant to use.

Were this presentation substantially true, and were it unaffected by correlative facts, appellant's right to an injunction against appellee, might easily be sustained. But there are material and important correlative facts. The claim of appellant is, that Horlick's Malted Milk was, and is, manufactured as follows: Coarsely ground malt and wheat flour are macerated in water, raising the temperature to 150 degrees F., holding it at that temperature for about half an hour, so as to insure the conversion of the starch in the flour into dextrine and maltose, or malt sugar; then raising it to a temperature of from 165 to 170 degrees F., holding it there for about fifteen minutes; then running it into a press and expressing all of the liquor out of the

mashed grain; then passing it through fine sieves; then evaporating this liquor to a thick syrup; then adding fresh cow's milk, the whole milk, then raising the temperature to at least 160 degrees in order to pasteurize; then evaporating in vacuum pans, where it is agitated, adding salt and bicarbonate of potash and soda, to the total amount of one-half of one per cent., then grinding the dry mass to a granulated form or powder, packing it in air-tight glass jars, with parafine sealing, and metal caps with screw connection.

June 5, 1883, appellant took out a process patent upon a granulated food for infants. The process is said to follow a process published in Ruth on Infants Foods, in 1876, and earlier by Liebig. The process is described in the patent as follows:

"In carrying out my invention I take equal parts of selected barley-malt and ground wheat (or oats) and thoroughly macerate or soften the same in pure fresh cow's milk, sufficiently to admit of the whole being stirred and mixed so as to form a loose soft mash. I then place the mash in a kettle provided with a steam-jacket, where it is gradually raised to a temperature of 150 degrees Fahrenheit, and kept constantly stirred or agitated, so as to prevent the possibility of any damage thereto by reason of the heat. The mash being kept at this degree of heat (150 Fahrenheit) for half an hour, the starch is thus transformed into dextrine and grape-sugar through the action of the diatase contained in the malt. It is then raised to the temperature of 170 degrees Fahrenheit, and retained at that degree of heat for fifteen minutes, after which it is taken out of the kettle, placed in bags, and pressed, the liquid extract running from the bags, when pressed, through very fine sieves, which serve to reject all husks and insoluble matter. This fine liquid is then put into a vacuum pan provided with a strong central shaft having teeth or knives, the latter serving, when the shaft is revolved, during the evaporation or drying of the extract, to keep the mass cut up into small parts until the whole is reduced to a dry powdered extract. This extract readily dissolves again in water, and is put up for public use in cans or bottles."

It will be noted, that while the process employed in the preparation of Horlick's Malted Milk is, in some respects, different from the process described in the patent, the product of both is a dry granulated powder, composed of milk and malt, supposedly affected, correlatively, by chemical action. Under enquiry by chemists, the two products might be distinguished by analysis; but so far as the purchasing public is concerned, they would probably pass for the same product.

Now, beginning with 1890, and continuing until the commencement of the action in the court below, the appellant placed on its commercial packages of Horlick's Malted Milk the words, "Patented June 5, 1883." It is perhaps significant that the patent mark was omitted from packages distributed gratuitously to physicians, and also from packages sent to Great Britain. The reason given by Mr. Horlick for thus marking the commercial packages sold in the United States was, that he believed he was entitled to the protection of the patent of June 5, 1883. However this may be, the effect on the public was to stamp the packages thus marked with notice that they were manufactured under the patent; and to some extent, at least, the patent notice afforded shelter against the competition of others.

It matters not, in our judgment, that the patent may not have been in fact valid; nor that the product,—malted milk—could not in fact have been covered by the description of the patent. The point is, that appellant chose to mark its product as if it were a monopoly,

thereby obtaining, measurably at least, the benefit of a monopoly; and gave to it a name, that became the generic name of the supposed monopoly. The case is thus brought, in our judgment, within the principle, if not the exact facts, of Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, and must be ruled accordingly.

The decree must be affirmed.