RICE-STIX DRY GOODS CO. v. J. A. SCRIVEN CO.

PREMIUM MFG. CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. November 19, 1908.)

Nos. 2781, 2782.

1. TRADE-MARKS AND TRADE-NAMES (§ 18*)—COLOR OF PATENTED ARTICLE—EFFECT OF EXPIRATION OF PATENT.

Complainant made and sold men's drawers under a patent which covered the insertion in the seams of a strip of elastic material, such strip as made by complainant being of knitted fabric made of Egyptian yarn, the natural color of which is yellow or buff, while the body of the garment was white. Complainant was not the first to use buff color in combination with white in such garments. *Held*, that on the expiration of the patent complainant not only ceased to have a monopoly in the elastic strip, but that it had no exclusive right to the use of buff-colored material for such strip, whether it was the natural color of the yarn or dyed.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 21; Dec. Dig. § 18.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 3*)—NAMES SUBJECTS OF OWNERSHIP—DESCRIPTIVE CHARACTER OF NAMES.

The name "elastic seam," as applied to drawers having a strip of elastic material inserted in the seams, is descriptive merely, and cannot be monopolized as a trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 6; Dec. Dig. § 3.*

Arbitrary, descriptive, or fictitious character of trade-marks or trade-names, see note to Searle & Hereth Co. v. Warner, 50 C. C. A. 323.]

3. TRADE-MARKS AND TRADE-NAMES (§ 11*)—NAMES SUBJECTS OF OWNERSHIP—NAMES OF PATENTED ARTICLES.

Where the manufacturer of drawers under a patent designated them by the name "elastic seam," by which name they become known to the public, such name became a term descriptive of the garment, and on the expiration of the patent others who thereby acquired the right to make the garment became also free to designate it by such name.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 15; Dec. Dig. § 11.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. PATENTS (§ 129*)—NAMES OF PATENTED ARTICLES—ESTOPPEL TO DENY VAL-
IDITY OF PATENT.

> The owner of a patent who has had the benefit of its protection, and manufactured thereunder during its full life, cannot thereafter assert its invalidity in support of his claim to a trade-mark in the name by which he designated the patented article and by which it became generally known.

> [Ed. Note.—For other cases, see Patents, Cent. Dig. § 182½; Dec. Dig. § 129.*]

5. TRADE-MARKS AND TRADE-NAMES (§ 70*)—UNFAIR COMPETITION—IMITA-
TION OF MARKS AND PACKAGES. ·

> A stamp used by defendant on drawers of its manufacture and the boxes in which they were sold *held* not so similar to those in use by complainant as to deceive purchasers or to constitute unfair competition.

> [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. § 70.*

> Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper &·Bros., 30 C. C. A. 376.]

> Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

S. L. Swarts and Fred W. Lehmann, for appellants.

Arthur v. Briesen (George W. Case, Jr., on the brief), for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and W. H. MUNGER, District Judge.

W. H. MUNGER, District Judge. These two cases involve the same questions, and were submitted together upon the same evidence. They differ in this, that the Premium Manufacturing Company manufacture the articles, and the Rice-Stix Dry Goods Company are the distributers or sellers of the articles.

The bills filed allege, in substance, the incorporation of complainant in the year 1891, its engaging in the manufacture of men's drawers, the body of the drawers being usually manufactured of white cotton material, with a buff or salmon colored strip down each side and the back thereof, and being so conspicuous as to distinguish such drawers from all others. It is alleged that the buff strip was adopted arbitrarily and solely for the purpose of identifying complainant's product. The bills further allege that complainant adopted as distinguishing marks for said goods the arbitrary and fanciful name "Elastic Seam," and certain peculiarly marked boxes, and a curved form of stamp, all of which were used in the manufacture and sale of said drawers. The bills also allege the expenditure of large sums of money by complainant in advertising and creating a market for its drawers, and allege that the term "Elastic Seam," and the curved form of stamp, and said boxes, as applied to and used with men's drawers, came to be recognized by the public and dealers as indicating and distinguishing the drawers of complainant. The bills allege the exclusive right of complainant to use said buff-colored strip, curved form of stamp, marked boxes, and the term "Elastic Seam." The bills also charge the defendants with

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

violating the rights of the complainant in that they are manufacturing and selling drawers, the body of which is of white material, with a buff or salmon colored strip down the sides, and are designating such drawers with the term "Elastic Seam," and further charging that they are using boxes in the sale of such drawers with markings similar to those upon complainant's boxes, and marking said drawers with a curved form of stamp in the similitude of complainant's. The prayer of the bills is in the usual form for an injunction and an accounting.

Defendants' answers deny that the complainant is entitled to the exclusive use of said buff or salmon colored strip, and deny that it is entitled to the exclusive use of the words "elastic seam"; that the said words "elastic seam" and the buff-colored strip are descriptive of the drawers; deny that its stamp is in the similitude of complainant's, and deny generally all the allegations of the bills. They further allege that on June 28, 1881, the United States issued to one C. A. Brown a patent covering the right to manufacture drawers with an elastic strip down the back and the sides of the legs, which patent was acquired by complainant; that complainant and its predecessors owning said patent manufactured its drawers under said patent; that said patent expired in June, 1898, and that since the expiration of said patent the right to manufacture drawers with such colored strips has been open to the public; that defendants did not engage in the manufacture or sale of such drawers until after the expiration of the patent.

A large amount of testimony was taken in support of the issues, and the Circuit Court entered a decree in each case in conformity with the prayer of the bill. Defendants have appealed.

From the pleadings and the evidence, three questions are presented for our consideration: (1) Has complainant a trade-mark in, and exclusive right to use, such buff or salmon colored strip, as a distinguishing feature from the color of the body of the drawers? (2) Has the complainant a trade-mark in, and therefore an exclusive right to, the use of the words "elastic seam," as applied to men's drawers? (3) Has the defendants' action in the manufacture and sale of men's drawers been such as to violate the rights of complainant and constitute unfair trade?

It is shown by the evidence that on June 28, 1881, one Charles A. Brown obtained letters patent from the United States for the combination in men's drawers of the woven body fabric and knitted insertions at the points of the seams and knitted bands at the bottom of the legs, these knitted insertions being a narrow strip down the side of the garment at the point of the seam, and to be either knitted or sewed to the body fabric, the purpose being to give elasticity to the garment. This patent was assigned to J. A. Scriven, and a partnership of which he was a member manufactured men's drawers under said patent until 1891, when the complainant corporation was organized by said Scriven, and it continued such manufacture during the life of the patent, which expired in 1898. During the life of the patent complainant and its predecessors enjoyed the full monopoly of the patent by being the sole and exclusive manufacturers of such drawers.

Complainant claims that it adopted the buff-colored strip in connection with the light-colored body of the garment as a distinguishing

feature of its manufacture, and thus has a trade-mark in the buff color when used as a feature distinctive from the color of the body of the garment. The combination of a buff color with the elastic strip, as distinguished from the color of the body of the garment, did not of itself, during the life of the patent, distinguish the article from those of other manufacturers, for the simple reason that drawers with an elastic strip could only be made, and were only made, by complainant and its predecessors. We think from the evidence that the use of the buff-colored strip was not arbitrary and for the purpose of giving the drawers a distinguishing feature in this respect The evidence shows that a knitted cotton cloth known as "balbriggan," made of Egyptian yarn, the natural color of which was buff, possessed greater elasticity than similar cloth knit from American cotton, the natural color of which was between a white and buff, and for commercial use was either bleached white or dyed buff, the bleaching and coloring of which took from it some of its elastic properties. For this reason the Egyptian cotton was used. The right to use the elastic knitted strip in combination with the woven body of the garment became public property, open to the use of all, upon the expiration of the patent, and we do not think complainant thereafter could have the exclusive right to the use of the color. This question was fully considered in the case of this complainant, J. A. Scriven Company v. Morris (C. C.) 154 Fed. 914, and it was held that complainant did not have, after the expiration of the patent, the exclusive right to the use of the combination of the light-colored body with the buff-colored strip. In the course of the opinion it was said:

"The complainant is now seeking to have the court rule that although, by the expiration of the patent, the use of the strip of insertion is free to all, the defendants are to be enjoined from using it because they use it of the same color as complainant and the patentee did when they were operating under the patent. To so decide would be in many cases to extend indefinitely the monopoly of the patent."

In this case the evidence does not show that the complainant was the first to use the buff color in combination with the light. The testimony affirmatively shows that prior to that use by complainant men's drawers were made of material the body of which was white and the bands at the ankles of which were elastic, buff-colored balbriggan.

The above case in 154 Fed. 914, was affirmed by the Court of Appeals of the Fourth Circuit, in 158 Fed. 1020, 85 C. C. A. 571, in the following opinion:

"We have carefully considered the questions raised by the appellant in appeal in this case, and are of opinion that the same are without merit. The learned judge who tried the case below wrote a carefully considered opinion, reported in 154 Fed. 914, in which we fully concur. The judgment of the lower court is therefore affirmed."

The reasons given in the opinion in that case by the trial judge are to our minds not only forceful but conclusive. The buff-colored strip, in combination with the light-colored body, became clearly descriptive of the article, and because complainant alone, during the life of the patent, manufactured the same, the color alone did not indicate to the public that such drawers were of complainant's make.

· Complainant and its predecessor advertised said drawers as Scriven's elastic seam drawers, and such drawers became generally known as "Elastic Seam." For this reason complainant claims it is entitled to the trade-name "Elastic Seam," as applied to drawers of such description, claiming that the term "elastic seam," was not descriptive merely of the article, but was an arbitrary or fanciful term. The law, we think, well stated by the Court of Appeals in Bennett v. McKinley, 65 Fed. 505, 13 C. C. A. 25, as follows:

"No principle of the law of trade-mark is more familiar than that which denies protection to any word or name which is descriptive of the qualities, ingredients, or characteristics of the article to which it is applied. An exclusive right to the use of such a word as a trade-mark, when applied to a particular article or class of articles, cannot be acquired by the prior appropriation of it, because all persons who are entitled to produce and vend similar articles are entitled to describe them and to employ any appropriate terms for that purpose. Whether a word claimed as a trade-mark is available because it is a fanciful or arbitrary name, or whether it is obnoxious to the objection of being descriptive, must depend upon the circumstances of each case. The word which would be fanciful or arbitrary when applied to one article may be descriptive when applied to another. If it is so apt and legitimately significant of some quality of the article to which it is sought to be applied that its exclusive concession to one person would tend to restrict others from properly describing their own similar articles, it cannot be the subject of a monopoly. On the other hand, if it is merely suggestive, or is figurative only it may be a good trade-mark notwithstanding it is also indirectly or remotely descriptive."

We think the term "elastic seam" descriptive merely. By the use of that term one would naturally conclude that at the seam there was something of an elastic character. The term "elastic seam," we think, would, to a person of ordinary intelligence, indicate that at the point of the seam some material of an elastic nature was inserted, and hence that the term cannot be said to be an arbitrary or fanciful one. In Trinidad Asphalt Mfg. Co. v. Standard Paint Co. (decided by this court August 11, 1908) 163 Fed. 977, are collated many cases illustrative of descriptive terms, and supporting the "settled rule that no one can appropriate as a trade-mark a generic name or one descriptive of an article of trade, its qualities, ingredients, or characteristics, or any sign, word, or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth." Had complainant not been protected by its patent, and others, therefore, been entitled to manufacture such drawers, such others might with equal truth have described the drawers of their manufacture as "elastic seam." After the expiration of the patent, defendants and all others had the right to manufacture men's drawers with the elastic strip extending longitudinally along the drawer at the point of the seam, and were also entitled to describe them, and we are unable to perceive any more appropriate words or term for that purpose than the expression "elastic seam."

In Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 199, 16 Sup. Ct. 1002, 1014, 41 L. Ed. 118, Justice White, after an analysis of many cases, says:

"The result, then, of the American, the English, and the French doctrine universally applied is this: That where, during the life of a monopoly created by a patent, a name, whether it be arbitrary or be that of the inventor, has become by his consent, either express or tacit, the identifying

and generic name of the thing patented, this name passes to the public with the cessation of the monpoly which the patent created."

This court, speaking by Justice Brewer, in Centaur v. Heinsfurter, 84 Fed. 955, 28 C. C. A. 581, said:

"The patent gave no right to any particular name, but simply to the exclusive manufacture and sale. All such rights expired in 1885, and from that time forth any party has had a right to manufacture and sell that particular compound, and also a right to manufacture and sell it under the name by which it has become generally known to the public; and if to the public the article has become generally known only by a single name, that name must be considered as descriptive of the thing manufactured, and not of the manufacturer. It is true that during the life of a patent the name of the thing may also be indicative of the manufacturer, because the thing can then be manufactured only by the single person; but when the right to manufacture and sell becomes universal, the right to the use of the name by which the thing is known becomes equally universal. It matters not that the inventor coined the word by which the thing has become known. It is enough that the public has accepted the word as the name of the thing, for thereby the word has become incorporated as a noun into the English language and the common property of all."

In Sternberg Mfg. Co. v. Miller, Du Brul & Peters Mfg. Co. (C. C. A.) 161 Fed. 318, complainant claimed a trade-mark to the words "vertical top," as applied to cigar molds. It was held by this court that the words "vertical top" became, during the life of the patent, associated with the manufactured article, as descriptive of its character and quality, and indicating the complainant's best grade of mold for making cigars, and hence could not be regarded as a trade-mark. Referring to and construing the rule as announced in the cases of Singer Mfg. Co. v. June Mfg. Co., and Centaur v. Heinsfurter, supra, Judge Philips, writing the opinion of this court, says:

"Counsel for complainant quite ingeniously attempts to differentiate the case at bar from the foregoing by the suggestion that the words 'Singer' and 'Castoria' describe the articles patented, and therefore necessarily became generic terms. But the essence of the ruling in the foregoing cases is that the patent conferred only the right of exclusion to manufacture and sell the article, and not the appropriation of any particular name, whether it was merely arbitrary or suggested by the thing itself, and that after the expiration of the patent, not only the right to manufacture and sell the patented article, but also to use the particular name by which the patentee had designated it, passed to the public."

It is clear, we think, from the foregoing authorities, that, even if the words "elastic seam" could, at the outset of their use by Scriven, have been regarded as fanciful or arbitrary, before the expiration of the patent under which complainant manufactured its drawers the words "elastic seam" had been given to such drawers by complainant and its predecessors under the patent, and had, to the mind of the public and to the trade, become the generic name of the article; in other words, the descriptive name thereof. Such being the case, upon the expiration of the patent, the use of such words was open to all, and we think there can be no doubt from the evidence that the words "elastic seam," as applied to drawers, came to be known and understood by the public to mean drawers having a strip of material at the place of the seam of an elastic nature. It is also true that such garments were

known as of complainant's make because, during the life of the patent, complainant was the sole manufacturer. But those words having become also a term descriptive of the garment, complainant's exclusive right, if any, to the same, expired with the exclusive right to manufacture. Wilcox Gibbs Sewing Machine Co. v. Gibbons Frame (C. C.) 17 Fed. 623; Coats v. Merrick Thread Co. (C. C.) 36 Fed. 324, 1 L. R. A. 616, affirmed in 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847; Greene, Tweed & Co. v. Mfg. Belt Hook Co. (C. C.) 158 Fed. 640; Featherbone v. Featherbone (C. C. A.) 141 Fed. 513; G. & C. Merriam Co. v. Ogilvie (C. C. A.) 159 Fed. 638. Also Sternberg Mfg. Co. v. Miller, Du Brul & Peters Mfg. Co., and Singer Mfg. Co. v. June Mfg. Co., and Centaur v. Heinsfurter, supra.

Complainant gave in evidence a United States patent, issued to one Philo H. Lee, dated July 11, 1876, for skin underwear, with pieces or strips of more porous material interposed where the seams of undergarments usually occur, and extending the entire length of the body of the undergarment. Said pieces or strips, being more porous, were for the purpose of admitting the passage of air outwardly through the garment, carrying off perspiration and other moisture and odors, and causing the garment to be more flexible. We need not consider the effect of the Lee patent upon the later Brown patent, because for the full life of the latter complainant and its predecessors industriously advertised that their elastic seam drawers were made under and protected by the Brown patent, and in that way they asserted a right to the monopoly apparently granted by that patent, secured the acquiescence of the public therein, and reaped the benefits thereof. In these circumstances the complainant will not now be permitted to say that the Brown patent was void as having been anticipated by the Lee patent, and hence that the buff-colored strip and words "elastic seam" became a valid trade-mark and were not dedicated to the public at the expiration of the Brown patent. Having derived, through the assertion of the validity of the Brown patent, all the advantages incident to the possession of a valid patent, it will not now be heard to assert the contrary, as a means of escaping consequences arising upon the termination of the monopoly secured through the patent. This is based upon the well-recognized rule that:

"Equity will refuse to aid a complainant in cases of this character, who is himself guilty of making material false statements in connection with the property he seeks to protect." Hilson v. Foster (C. C.) 80 Fed. 896.

In Horlick's Food Co. v. Elgin Milkine Co., 56 C. C. A. 544, 120 Fed. 264, complainant sought the aid of the court to protect it against the claimed trade-mark of the term "malted milk." Complainant had obtained a process patent upon a granulated food for infants. The article which he in fact manufactured was not in accordance with the process, but the packages in which the articles were sold were marked as patented, and it was claimed that, as the product was not manufactured under the patent the trade-name "malted milk" did not become public property on the expiration of the patent. The court said:

"It matters not, in our judgment, that the patent may not have been in fact valid, nor that the product—malted milk—could not in fact have been cover-

ed by the description of the patent. The point is that appellant chose to make its product as if it were a monopoly, thereby obtaining, measurably at least, the benefit of a monopoly; and gave to it a name, that became the generic name of the supposed monopoly. The case is thus brought, in our judgment, within the principle, if not the exact facts, of Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, and must be ruled accordingly."

In Leather Cloth Co. v. American Leather Cloth Co., 4 De Gex, J. & S. 137, 142, it is said:

"When the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not, in his trade-mark or in the business connected with it, be himself guilty of any false or misleading representations; for, if the plaintiff makes any material false statement in connection with the property he seeks to protect, he loses, and very justly, his right to claim the assistance of a court of equity."

On appeal in the House of Lords, 11 H. L. Cas. 523, Lord Kingsdown said:

"Nobody doubts that' a trader may be guilty of such misrepresentations with respect to his goods as to amount to a fraud upon the public, and to disentitle him on that ground, as against a rival trader, to the relief of a court of equity which he might otherwise claim. * * * The general rule seems to be that the misstatement of any material fact calculated to deceive the public will be sufficient for that purpose. * * * If a trade-mark represents an article as protected by a patent when in fact it is not so protected, it seems to me that such a statement prima facie amounts to a misrepresentation of an important fact, which would disentitle the owner of the trade-mark to relief in a court of equity against one who pirated it."

To the same effect are the following cases: Consolidated Fruit Jar Co. v. Dorflinger, Fed. Cas. No. 3,129; Lorillard v. Pride (C. C.) 28 Fed. 434; Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706; Prince's Mfg. Co. v. Prince's Metallic Paint Co., 135 N. Y. 24, 31 N. E. 990, 17 L. R. A. 129; Preservaline Mfg. Co. v. Heller Chemical Co. (C. C.) 118 Fed. 103; Halzapfel's Co. v. Rahtjens Co., 183 U. S. 1, 22 Sup. Ct. 6, 46 L. Ed. 49.

It matters not that complainant may have supposed the Brown patent to have been a valid one, for, as said by the court in Dadirrian v. Yacubian, 39 C. C. A. 321, 98 Fed. 872–877:

"It is to be noted in this connection that the court is not bound to inquire whether or not the representations are false, in the obnoxious sense of the word, because it is sufficient that they are in their nature misleading, if they are also material, and do in fact mislead. Indeed, that the public are equally prejudiced by deceptive statements in a trade-mark, or in connection therewith, whether the purpose of its owner was fraudulent or not; that therefore the equity courts have no occasion to inquire into his secret intents; and that such courts will not protect a business built up as the result of deceptive representations, whatever were those secret intents—are such fundamental rules in the law of trade-marks that we have no occasion to elaborate them, or to cite authorities in reference to them."

The question remains, have the defendants been guilty of unfair trade; in other words, attempted to palm off on the trade and public the drawers manufactured by the Premium Manufacturing Company as and for the drawers of complainant's manufacture? The only evidence, we think, from which such conclusion can be drawn, is the

markings upon the drawers and packages or cartons. Defendants had the right, as we have seen, to use the buff-colored strip and the words "elastic seam." Those words and the buff-colored strip, however, during the life of the patent had become not only descriptive of the articles, but the public had come to know that they were manufactured by complainant. It then became and was the duty of defendants, in selling their drawers manufactured with the buff-colored strip, and described as "elastic seam" drawers, to indicate to the public that their articles were not those of complainant's manufacture. For, as held in Singer Mfg. Co. v. June Mfg. Co. and G. & C. Merriam Co. v. Ogilvie, supra:

"Where another avails himself of the principle of public dedication, he must in good faith fully identify his production and clearly disassociate his work from the work of one who has given significance to the name, and sufficiently direct the mind of the trading public to the fact that though the thing is of the same name that it is something produced and put upon the market by himself."

Complainant usually stamped upon the drawers of its manufacture words and figures in the following form:

On some of its drawers of more recent make, date of patents were given as February 28, 1888, and April 12, 1892, referring to subsequent patents not involved in this case, and on some of still more recent make no date of patent was given.

Defendants stamped upon their drawers the words and figures in form as follows:

As the numerals above given, 32 and 29 on complainant's stamp, and 28 and 31 on defendants', indicate the waist size and length of same, they are changed according to the respective sizes. The boxes or cartons of each in which the drawers are placed and displayed on the shelves of the retail dealer are of the same dimensions, but, as they are of the most convenient and appropriate size for the use to which they are applied, such fact alone does does not establish simulation. The boxes or cartons of each party are white in color. Those of complainant have a gilt strip along the top edge; those of defendants have not. On the top of complainant's boxes are the words "Scriven's Patent Elastic Seam Drawers," and a cut of a pair of drawers, showing the elastic strip at the side and elastic piece at the bottom. On the front or display end of complainant's boxes are the same words and cut as upon the top, in addition the arbitrary number 50, and figures and words indicating the size of the waist and length of the seam; the words and figures being in blue ink.

There are no markings on the top of defendant's boxes, and on the front or display end are the words and figures:

| 985 | WARRANTED FINEST QUALITY. | ½ DOZ. |
|---|---|---|
| PREMIUM | | ELASTIC JEAN DRAWER. |
| trade-mark | | |
| UNION MADE. | | Waist...... Length...... |

—with the words indicating the size of waist and the length. The words and figures are in black ink, except that the word "Premium," which is made quite conspicuous, is in red, and the words "trade-mark" under it are in white on red background.

Defendants manufactured and sold three classes of these drawers, viz., jean, nainsook, and canton. The markings of each were the same as above described, except the word "Nainsook" was used in the place of "Jean" on the markings of nainsook, and "Canton" in the place of "Jean" on the markings of the canton drawers.

The difference in the markings are such as to disprove simulation, and clearly disassociate defendants' drawers from those of complainant.

For these reasons, the decree rendered in each case is reversed, with directions to dismiss the bill.

SANBORN, Circuit Judge (dissenting). The court below appears to have been of the opinion that the evidence in this case proved that about 1885 the predecessor in interest of the complainant commenced to make and to sell drawers which he called "elastic seam" drawers, which were made of jean or other inflexible fabrics, down the legs of which were inserted strips of knit and flexible material of a buff color in the form of a parallelogram; that this predecessor and the complainant have ever since continued to make and sell such drawers with the buff color of the parallelograms therein; that these buff-colored parallelograms and the words "elastic seam" came, many years before the defendants commenced to use them, to signify the complainant's make of drawers; that neither the buff-colored parallelograms in the drawers nor the words "elastic seam" ever signified, before Scriven selected and applied them to garments of his make, drawers with parallelograms or flexible materials inserted in inflexible bodies; that neither of these marks had ever been used before Scriven applied them; that Scriven selected and used the form and the buff color of the flexible strips in the beginning for the sole purpose of marking the drawers as his manufacture; that he selected and applied to them the name "Elastic Seam" for the same purpose; that each of these marks was arbitrary and fanciful, and when Scriven first used them, and before he had taught the trade their meaning, neither described the drawers he made to persons of ordinary intelligence; that the complainant acquired the patent issued to C. A. Brown in 1881, No. 243,498, for gussets or gores of a knit fabric inserted in the arms and sides of shirts and in the legs of drawers the bodies of which were made of inflexible material, and that the complainant advertised its drawers as patented thereunder, but that the Brown patent secured no monopoly to any one, because it was anticipated by letters patent No. 179,661, is-

sued to Philo H. Lee in 1876, for the insertion in the sides and arms of shirts and in the legs of drawers made of the tanned skins of animals of strips of a fabric suitable for clothing which were more flexible and porous than the bodies of the garments; and that the defendants have used and are using the buff-colored strips and the term "elastic seam" to sell drawers manufactured by them or by one of them. A careful examination of the record has forced my mind to the conclusion that these facts were established by a fair preponderance of the evidence, and to an agreement with the learned judge below, so that I am regretfully constrained to dissent from the opinion of the majority of this court.

In Singer Mfg. Co. v. June Mfg. Co., 163 U S. 169, 178, 186, 189, 201, 204, 16 Sup. Ct. 1002, 41 L. Ed 118, Centaur Co. v. Heinsfurter, 84 Fed. 955, 956, 28 C. C. A. 581, and Sternberg Mfg. Co. v. Miller, Du Brul & Peters Mfg. Co. (C. C. A.) 161 Fed. 318, cited by the majority, the courts held that in a case in which, during the life of a patented monopoly, the owner had conferred an arbitrary or generic name upon the patented article by which alone it had come to be known during the term of the monopoly, such as "Singer" and "Castoria," the right to use that name passed to the public upon the expiration of the monopoly But this conclusion is an exception to the general rule that no one may lawfully use the trade-mark or trade-dress of another to sell goods of his own manufacture, and it is inapplicable to the cases at bar, because the Brown patent secured no monopoly of the manufacture or sale of the drawers made by the complainant, and hence under those decisions no right to use the complainant's trade-mark passed to the public when the term of the void patent expired. The patent to Lee was issued about five years before the patent to Brown, and it clearly anticipated it and deprived it of all legal effect. The patent to Lee related to the same art as did the Brown patent, to the art of clothing by means of undergarments: it disclosed the use of strips of more flexible and porous materials along the sides of garments the bodies of which were made of inflexible materials, and it left nothing of this subject-matter for Brown to either invent or secure.

It is, however, said that the complainant is estopped from denying that the Brown patent secured a monopoly to it, and hence from sustaining its trade-mark, because it advertised and sold its drawers as patented under this patent, and because it actually enjoyed a monopoly of the manufacture and sale of them until the term of the patent expired. The indispensable elements of an estoppel in pais, however, are: (1) Intentional or reckless misrepresentation of a known fact inconsistent with the subsequent claim of him who makes the misrepresentation; (2) ignorance of the truth and absence of equal means of knowledge of it by the party who claims the estoppel; (3) action by the latter induced by the misrepresentation; and (4) injury to the latter if the truth is permitted to be proved. Bigelow on Estoppel (4th Ed.) p. 679. The alleged estoppel in this case lacks, as it appears to me, at least three of these essential elements, viz., intentional or reckless misrepresentation by the complainant, absence of knowledge and of equal means of knowledge of the truth by the defendants, and possible injury to them by proof of the truth. It is not, in my opinion, such a

false representation as will sustain an estoppel for the owner of a patent, void, but not yet adjudged void, because anticipated by another which is of record, to assert that his manufacture, which is covered by it, is patented thereby, and that was all the misrepresentation which the complainant made here. That statement lacks the moral turpitude or the reckless disregard of the rights of others essential to sustain an estoppel, because it is a true statement of the existence of the patent, and it leaves its legal effect for the consideration and determination of others who may be interested therein. A willful intent to deceive, or such gross negligence of the rights of others as is tantamount thereto, is an essential element of an estoppel in pais. There must be some moral turpitude or some breach of duty. Henshaw v. Bissell, 1 Wall. 255, 271, 21 L. Ed. 835; Bank v. Farwell, 7 C. C. A. 391, 394, 396, 58 Fed. 633, 636, 639 Again, the facts which disclosed the invalidity of the Brown patent were equally accessible to the defendants and to the plaintiff. They were exhibited by the Lee patent, and the defendants had the same means of knowledge upon this subject as did the complainant. And in the third place no injury could be inflicted upon the defendants by proof of the truth. The only effect of such proof would be to deprive them henceforth of the use of the complainant's trade-marks, and they would not have been entitled to use these trade-marks if the complainant had never represented that its drawers were patented under the Brown patent.

Nor does it seem to me that a patentee who marks his product patented and advertises it as such while it is actually protected by a patent which is prima facie valid, although that patent subsequently turns out to be anticipated by another, is guilty of such iniquity as will repel him from a court of equity and deprive him of all relief at its hands against the continuing wrongful appropriation of his trade-marks by another. The acts of Congress declare that it shall be the duty of all patentees, and of their assigns, to mark any patented article, or the package which contains it, with the word "patented," and they penalize the affixing of that or any similar word to an article which is not patented. Rev. St. §§ 4900 and 4901 (U. S. Comp. St. 1901, p. 3388). But neither the statutes, the laws, nor the decisions of the courts appear to me to impose any penalty upon one who discharges this duty because the patent under which he marks and advertises his product is subsequently found to be anticipated. The marking and the advertising were intended to constitute caveats, notices of the existence of the patents, to the end that all parties might examine and learn for themselves whether or not their prima facie validity would be their ultimate legal effect.

Courts of equity often refuse relief to one who has made false statements calculated to deceive, relevant and material to the subject of a controversy, in the enforcement of the maxim that "he who seeks equity must come with clean hands." But the averment that the article is patented when the patent under which it is marked and advertised is anticipated by another of record is not a false statement, and does not render a petitioner's hands unclean, because the fact is that the article is patented when a patent is issued upon it by the Patent Office, and the true and entire meaning of such a statement is not that in no

future litigation or consideration will the patent be found to be void, but it is simply that the patent has been issued and that it is prima facie valid.

Every relevant decision cited by the majority is sustained by a material false statement made by the complainant, while, as it seems to me, there was no false statement in the representation of the complainant that his article was patented in the case at bar. The quotations from the opinions of the courts found in the opinion of the majority must be read with due reference to the facts the courts were there considering. In Hilson Co. v. Foster (C. C.) 80 Fed. 896, the false statement upon which the decision was founded was that only the best grade of Havana tobacco was used in the cigars. In Horlick's Food Co. v. Elgin Milkine Co., 120 Fed. 264, 56 C. C. A. 544, the false representation was that the malted milk of the complainant was made in accordance with the specifications of the process patent with which it was marked; that is to say, the proof was that the complainant had marked its product patented when it was not in fact covered by any patent. This false statement was material to sustain the decree, and the paragraph quoted from the opinion by the majority was unnecessary to the decision of the case, and it fails to commend itself to my judgment. There was no question of the validity of the patent under which the product was marked in that case, and it seems to me that in such a case it is material and is the very essence of the issue whether the statement that the product is made in substantial accord with the patent—that is to say, whether it is patented—is false or true.

In Leather Cloth Company, Limited, v. American Leather Cloth Co., Limited, 4 De Gex, Jones & Smith's Reports, 137, 147, 149, and Leather Cloth Co. v. American Leather Cloth Co., 11 H. L. Cas. 523, 531, the false statements which induced the decisions were that the complainant's products were those of the Crockett International Leather Cloth Company when they were not, that they had been made by J. R. & C. P. Crockett & Co. when they had not been, that they were made of tanned leather in accordance with the specified patent upon tanned leather when they were made of untanned leather and were not made in accordance with the patent, and that they were made either in the United States of America or at West Ham in England when they were not made in either place. How radically different in character, in tendency to deceive, and in natural effect are these statements from the truthful statement of the defendant that its product was patented when a patent prima facie valid existed upon it. It was of these false statements that Lord Kingsdown spoke in the excerpt quoted by the majority. And his remark, that "If a trade-mark represents an article as protected by a patent, when in fact it is not so protected, it seems to me that such a statement prima facie amounts to a misrepresentation of an important fact which would disentitle the owner of the trade-mark to relief in a court of equity against any one who pirated it," related to the false statement that the leather company's products were made of patented tanned leather when in fact they were made of leather that was neither tanned nor patented. The question whether a statement that a product was patented when it was so, but the patent was anticipated by another of record, is so misleading or

deceptive as to bar from relief in equity, was not presented in that case, was not considered by any of the members of the court, was not decided, and the remarks of Lord Kingsdown had no reference to it. In Dadirrian v. Yacubian, 39 C. C. A. 321, 326, 98 Fed. 872, 877, the false and deceptive representations which inspired the excerpt quoted by the majority and sustained the decision were that the product, "Madzoon," originated around Mt. Ararat, was used in Asia Minor largely as food and as medicine in every form of febrile diseases, and that the inhabitants of Asia Minor and Arabia during the season of intense heat resorted to it to allay their burning thirst and drank freely of it while enjoying the luxury of the Turkish bath. In Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706, the misleading statement was that the medicine was made by the complainant in New York when it was made by another in Massachusetts. In Prince Mfg. Co. v. Prince's Metallic Paint Company, 135 N. Y. 24, 31 N E. 990, 17 L. R. A. 129, the false statement was that the trade-mark covered an article to which it did not apply, and to this statement was added the misleading act of the sale of that article under that trade-mark.

The decision in Lorillard v. Pride (C. C.) 28 Fed. 434, 438, wherein Judge Blodgett held that the term "Tin Tag,' which was not adopted or applied as a trade-mark by the complainant, but came during the life of the patent to be the name of tobacco to which a tin tag was attached, and for which with this tag attached the complainant had procured a patent, passed to the public when the patent was adjudged void, and the decision in Holzapfel's Co. v. Rahtjen's Co., 183 U. S. 1, 8, 22 Sup. Ct. 6, 46 L. Ed. 49, wherein the Supreme Court held that the sale of an article as patented upon which no patent had issued would not establish a trade-mark of which the word "patent" was an essential part, do not seem to me to be relevant to the issue before us. And the decisions in Consolidated Fruit Jar Co. v. Dorflinger, Fed. Cas. No. 3,129 that the use of the designation "Mason's Patent, Nov. 30th, 1858," after the patent had been adjudged void, was misleading and fatal to relief against a pirate, and in Preservaline Mfg. Co. v. Heller Chemical Co. (C. C.) 118 Fed. 103, that the representation that an article is patented after the patent has expired is false, misleading, and fatal, fail to reach the question in this case, because here the patent was in existence, it had not been adjudged void, and the statement that it was patented was true. The authorities cited by the majority have been reviewed for the purpose of showing, if possible, that while general expressions may be found in the opinions of the courts which, when read without the facts and issues then before the judges in mind, might seem broad enough to refer to it, yet in none of these cases where the question was at issue and necessarily decided has any court held that a patentee who has simply discharged his statutory duty to mark his product patented and has advertised it as such while the patent, which subsequently turns out to be anticipated by another, is prima facie valid, has thereby become guilty of such iniquity as renders his hands unclean, repels him from a court of equity, and bars him from all relief against those who boldly appropriate his trade-marks or his other property. Such a decision, it seems to me, must necessa-

rily bar from relief in the courts of equity a very large number of patentees who are simply discharging their statutory duty and telling the truth by stating and advertising the fact that their products are patented, because it is common knowledge that many patents which are prima facie valid subsequently turn out to be anticipated by prior inventions which are described in the Patent Office. I am unwilling to place the ban of iniquity which closes the courts of equity upon patentees of this class. And because a statement that an article is covered by a patent when it is in fact patented, though it subsequently turns out that the patent is anticipated by another, is in fact true and neither deceptive nor misleading, because the facts regarding such a patent are spread upon the record of the Patent Office and alike open to all, because every one is presumed to know the law and hence to know whether or not the prior patent anticipates the later one, while in fact no one ever does know whether it anticipates or not until that question is adjudicated by some court, and until that time the law presumes the patent to be valid, and because it seems to me that it cannot be an iniquitous misrepresentation to state that to be true which the law presumes, I am of the opinion that such a statement and advertisement should not deprive this complainant of the equitable relief to which it is otherwise entitled. Sykes v. Sykes, 3 Barnewall & Cresswell's Reports, 541, 545; Edelstein v. Vick, 11 Hare, 86, 87; Morgan v. McAdam, 36 Law J. Ch. 229, 231.

Another conclusion to which I am unable to assent is that, in the absence of the rule in the Singer Case and in the absence of the Brown patent, the buff color could not constitute a valid trade-mark, because it selection was not arbitrary and for that purpose, and because that color had been used with anklets upon white bodies. It is not the buff color that constitutes a trade-mark here, but the buff-colored strips in the definite form of narrow parallelograms inserted in the sides of drawers whose bodies are composed of materials of a white or other contrasting color. Mere color of any kind may not constitute a trade-mark. But in my opinion colored parts of garments or of other articles of definite specific forms in contrast with parts colored otherwise may constitute perfect trade-marks. "A trade-mark is always something indicative of origin or ownership by adoption and repute, and is something different from the article itself." Fairbanks v. Jacobus, 14 Blatchf. 337, 339, Fed. Cas. No. 4,608. The buff color of the strips in the specific form of a parallelogram was not an essential part of the drawers. They would have been equally flexible and useful if the strips had been of any other color. Scriven and Stranahan testified, the court below found, and the entire evidence has led my mind to the same conclusion, that Scriven arbitrarily selected the buff color of the strips in this case for the sole purpose of marking his manufacture when he commenced it, and that his goods became known by that mark long before the defendant commenced to use it. The fact that buff-colored anklets were used with white bodies does not seem to me to affect the right of the complainant here. His trademark is not the buff color of one indefinite part attached to a white body; it is the buff color of the strips in the specific form of a parallelogram located along the sides of the legs of the drawers whose

bodies are made of material of a white or other color. And, because the buff color of these strips is in no way material to give the drawers all the elasticity and other beneficial characteristics sought and secured by the complainant, because the strips which Scriven caused to be buff in color were definite and specific in form and location in garments whose bodies were of a contrasting color, because the evidence convinces me that this buff color was selected and applied to these strips of specific form and location by Scriven to distinguish his make of these drawers from those of all others, and because it had produced that result long before the defendant commenced to use it, it appears to me that it constituted a valid trade-mark, and that the decree which enjoined the defendants from using it was right.

The question whether or not the term "elastic seam" was so descriptive of the complainant's drawers as to disqualify it for a trade-mark is not whether it described them when the defendants applied it to their manufactures subsequent to 1898, nor is it whether it so describes them now. The test of disqualification is, did it so clearly describe them, their qualities and characteristics, about 1885, when Scriven first adopted it, that men of ordinary experience in the trade would at that time have conceived the Scriven drawers upon hearing the term for the first time? Wellcome v. Thompson & Capper, 1 L. R. Ch. Div. 1904, pages 736, 742, 749, 750, 754; Keasbey v. Chemical Works, 142 N. Y. 467, 471, 474, 475, 476, 37 N. E. 476, 40 Am. St. Rep. 623. The proof is uncontradicted that no drawers with flexible strips inserted in them had ever been made before. The only elastic seam known at that time was one made by sewing machines by sewing materials together in a zigzag instead of in a straight line, and the term "elastic seam" drawers could not have conveyed to the minds of men the idea of jean drawers with flexible strips of knit material inserted in the sides of the legs before Scriven taught them by his application of the term to the drawers and his advertisement of them that this was the meaning which he gave to it. Words which are merely suggestive of the qualities, ingredients, or characteristics of the articles to which they are applied, but which do not so accurately describe them that men of ordinary intelligence would have recognized them upon seeing or hearing the words when first applied, constitute valid trade-marks. Such terms are "elastic" applied to bookcases (Globe-Wernicke Co. v. Brown [C. C.] 121 Fed. 185, 186); "Tabloid" (Wellcome v. Thompson & Capper, 1 L. R. Ch. Div. 1904, pp. 736, 744); "Bromo-Caffeine" (Keasbey v. Brooklyn Chemical Works, 142 N. Y. 467, 471, 474, 475, 476, 37 N. E. 476, 40 Am. St. Rep. 623); "Cottolene" (N. K. Fairbank Co. v. Central Lard Co. [C. C.] 64 Fed. 133, 134); "Cocoaine" (Burnett v Phalon, 9 Bosw. [N. Y.] 192); "Maizena" (Mfg. Co. v. Ludeling [C. C.] 22 Fed. 823); "Valvoline" (Leonard v. Lubricator [C. C.] 38 Fed. 922); "Bromidia" (Battle v. Finlay [C. C.] 45 Fed. 796); "German Sweet Chocolate" (Walter Baker & Co. v. Baker [C. C.] 77 Fed. 181, 187, 188); "Anti-Washboard" (O'Rourke v. Central City Soap Co. [C. C.] 26 Fed. 576, 578); "No-To-Bac" (Sterling Remedy Co. v. Eureka Chemical & Mfg. Co., 80 Fed. 105, 25 C. C. A. 314); "Swan Down," applied to a complexion powder (Tetlow v. Tappan [C. C.] 85 Fed. 774); "Silicon" and "Electro-

Silicon," applied to an article one of whose component parts was "Silicon" (Electro-Silicon Co. v. Hazard, 29 Hun [N. Y.] 369); "Celery Compound" (Wells & Richardson Co. v. Siegel, Cooper & Co. [C. C.] 106 Fed. 77); "Cream" (Price Baking Powder Co. v. Fyfe [C. C.] 45 Fed. 799); "Lightning," applied to hay-knives (Hiram Holt Co. v. Wadsworth [C. C.] 41 Fed. 34); "Maryland Club," applied to whisky (Cahn v. Gottschalk, 14 Daly, 542, 2 N. Y. Supp. 13); "Cough Cherries" (Stoughton v. Woodard [C. C.] 39 Fed. 902); "Sliced Animals," "Sliced Birds," "Sliced Objects," applied to dissected puzzle pictures (Selchow v. Baker, 93 N. Y. 59, 45 Am. Rep. 169); "Saponifier" (Pennsylvania Salt Mfg. Co. v. Myers [C. C.] 79 Fed. 87); "Insurance Oil" (Ins. Oil Tank Co. v. Scott, 33 La. Ann. 946, 39 Am. Rep. 286); "Congress Water" and "Congress Spring" (Congress & Empire Spring Co. v. High Rock Congress Spring Co., 45 N. Y. 291, 6 Am. Rep. 82); "Magnetic Balm," applied to a medicine (Smith v. Sixbury, 25 Hun [N. Y.] 232), and such a term, in my opinion, was "elastic seam" when applied to the drawers which the complainant made and sold under that name. As this term seems to me to constitute a valid trade-mark and the defendants are using it to sell goods of their manufacture, I agree with the court below that the complainant was entitled to an injunction to restrain them from so doing, both upon that ground and also because in my opinion the defendants were guilty of unfair competition by their use of the buff-colored strips and the term "elastic seam" to sell the goods which they make as those made by the complainant, and this upon the authority of Thompson v. Montgomery, 41 Ch. Div. 35, 38, 47, 51; Montgomery v. Thompson, Appeal Cas. 217, 220; Lee v. Haley, 5 Ch. App. 155, 161; Wotherspoon v. Currie, L. R. 5 H. L. 508, 522, 523; Brewery Co. v. Powell (1897) App. Cas. 710, 716; American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263; Flour Mills Co. v. Eagle, 86 Fed. 608, 628, 30 C. C. A. 386, 406, 41 L. R. A. 162; American Brewing Co. v. St. Louis Brewing Co., 47 Mo. App. 14, 20; Cady v. Schultz, 19 R. I. 193, 32 Atl. 915, 29 L. R. A. 524, 61 Am. St. Rep. 763; Newman v. Alvord, 49 Barb. (N. Y.) 588; McLean v. Fleming, 96 U. S. 245, at pages 254, 255, 24 L. Ed. 828; Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 674, 21 Sup. Ct. 270, 45 L. Ed. 365; Reddaway v. Banham (1896) App. Cas. 199, 204, 211, 215; Buzby v. Davis, 80 C. C. A. 163, 165, 166, 150 Fed. 275, 277, 278; Shaver v. Heller & Merz Co., 48 C. C. A. 48, 59, 108 Fed. 821, 832, 65 L. R. A. 878.