DADIRRIAN v. YACUBIAN et al.

(Circuit Court of Appeals, First Circuit. January 3, 1900.)

No. 287.

1. TRADE-NAMES—FOREIGN NAME OF ARTICLE.

A word which has been for centuries in Armenia the name of an article of food or diet prepared from sterilized and fermented milk cannot be appropriated as a trade-name by the person who introduced the article and the name into this country.

2. SAME—SIMILARITY BETWEEN NAMES.

The fact that a correct transliteration of the Armenian word into English would make it "Madzoon," rather than "Matzoon," does not render the latter subject to monopoly as a trade-name; the difference between the two words being too slight to be recognized as creating a distinction in the law of trade-marks.

3. SAME—SUIT FOR INFRINGEMENT—EQUITABLE ESTOPPEL.

The rule applied that a complainant cannot maintain a suit in equity to protect his monopoly in the use of a trade-name, which is in fact the name of an article well known in foreign countries, on the ground that the product to which he applies it is a new article of manufacture, and not the article of which the name is descriptive, where he has represented by his labels and otherwise that it was such article, and has built up the business which he seeks to protect upon such representations.

4. SAME—UNFAIR COMPETITION.

Applying the rule that when a trade-name of a descriptive character has been used by a manufacturer for so long a time, and has come to be so associated by the public with his goods that it makes it the duty of another, who then commences its use in connection with a product of his own, to couple with it such caution as is suitable to guard the public from confusing the source of production, the latter, under the facts of this case, is *held* to have done all that can be required.[1]

[1] As to unfair competition in trade, see note to Scheuer v. Muller, 20 C. C. A. 165, and, supplementary thereto, note to Lare v. Harper & Bros., 30 C. C. A. 376.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

James R. Sheffield (Frederic H. Betts and James J. Cosgrove, on the brief), for appellant.

Alexander P. Browne (Everett D. Chadwick, on the brief), for appellees.

Before PUTNAM, Circuit Judge, and ALDRICH and LOWELL, District Judges.

PUTNAM, Circuit Judge. We assent to the decree entered in this case by the circuit court, and to the principles of law stated in the opinion of the learned judge who sat in that court (90 Fed. 812); but, apparently, certain phases of the facts have been urged upon us more strenuously than they were urged below, so that we find it necessary to give expression to our views about them.

The trade-mark of the complainant below (now the appellant) was registered by virtue of an application filed on August 7, 1885, under the act of March 3, 1881 (21 Stat. 502). The application is given at length in the record, and conforms to the statute; so that, in accordance with the provisions of section 7 thereof, and, indeed, independently of that, the registration is prima facie evidence of the complainant's ownership of the alleged trade-mark, and therefore of whatever is necessary to establish its validity. The application states that the complainant had used the trade-mark since on or about the 17th day of July, 1885. It is also clear that the complainant remained, within the United States, in the exclusive and undisturbed possession and use of the alleged trade-mark for about seven years, and that he had meanwhile not only enjoyed an extensive and valuable trade in connection therewith, but that he created it, so far as this country is concerned. This is true to so striking an extent that till, and even through, the time of taking the proofs in this case, it is apparent that, with the larger portion of the community accustomed to the use of the article put on the market by the complainant in connection with his alleged trademark, including, indeed, a number of the members of the medical profession, the article and the complainant's name were linked together to such an extent that when the same article, or a similar one, was put on the market by the alleged infringers, the common understanding was blind to the fact that there were any new sources of production; and the article, by whomsoever sold or produced, and notwithstanding noticeable changes in the labels, was frequently accepted by intelligent persons, including members of the medical profession, as the complainant's article. These facts, of course, make a very strong prima facie case for the complainant; so that neither justice to him, nor the interests of the public, will permit the denial of the relief which he asks, unless legal principles clearly require it.

Turning back to the complainant's trade-mark registration, its leading element is that it states its "essential feature is the arbitrarily selected word symbol 'Matzoon.'" Accompanying the application

was a fac simile of the label as "generally" arranged, as to which the application said that the word "Matzoon" is printed in a straight line, with, immediately below it, the words "or Fermented Milk Food," and below that a pictorial representation of Mt. Ararat, surmounted by the ark, to which the dove is just returning, bearing an olive branch. Nevertheless, the application said that the words "or Fermented Milk Food" and the pictorial representation might be omitted without altering the trade-mark; stating in this connection (what we have already said) that its essential feature was the word symbol "Matzoon." In accordance with the statute, the application further stated that the class of merchandise to which the trade-mark had been appropriated was medicinal preparations, and that a more particular description would be "a medicinal beverage consisting of a fluid preparation of fermented milk," "especially adapted as a nutritious food for invalids," and as a remedy for various diseases which were named, and which we need not repeat.

The substantial defense rests on the proposition that the word "Matzoon" is not an arbitrarily selected word symbol, but that the complainant's article of merchandise is a historically and locally well known Armenian healthful beverage, containing certain medicinal qualities, of which "Matzoon" is the proper Armenian descriptive word; so that, notwithstanding the facts to which we have referred, every person has the right to import the article and sell it under its proper Armenian name, or to produce the article in this country and sell it in the same way. The facts being so established, there would be no question that the rules of law accepted by the circuit court would apply, and it would be impossible to maintain an exclusive right in behalf of the complainant, no matter how strong the equities might be in his behalf.

It is insisted, however, in reply, that "Matzoon" is a word symbol—First, because the Armenian word, when correctly transliterated, is "Madzoon," and not "Matzoon"; second, because the Armenian product known as "Madzoon" is not a beverage, and does not have the liquid form which characterizes the merchandise put on the market by both the complainant and the respondents, but is solid, as an ordinary cup custard or blancmange is solid; and, third, as alleged in the bill, that complainant's product is "a new article of manufacture."

The first ground of the complainant's reply is clearly not sufficient, because any distinction between "Madzoon" and "Matzoon" is too refined to be of use with reference to rules so practical as those which appertain to trade-marks. Section 3 of the act of March 3, 1881, contains a prohibition against registering any alleged trademark "which is identical with a registered or known trade-mark owned by another and appropriate to the same class of merchandise, or which so nearly resembles some other person's lawful trade-mark as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers." This is a very practical expression of a fundamental rule touching trade-marks. While, on the one hand, if the complainant could lawfully claim the word

"Matzoon," it would be plain that other persons could not use the word "Madzoon," because the two words so nearly resemble each other as to be likely to cause confusion or mistake, as expressed in this citation from the statute, so, on the other hand, if the public at large is entitled to use the word "Madzoon," it is quite clear that the word "Matzoon" would come so well within the practical rules applicable to trade marks as to prevent any lawful appropriation thereof for a monopoly. Therefore, without going into any philological discussion for the purpose of showing how, in different localities, or at different dates, slight changes in pronunciation occur, which make, for practical purposes, "d" and "t" the same letter, the distinction which complainant makes in this respect is too refined for practical uses in this branch of the law.

With reference to the second ground of reply on the part of the complainant, the opinion of the learned judge of the circuit court finds the facts against him, and apparently adopts the conclusions of Judge Showalter in Dadirrian v. Yacubian, 72 Fed. 1010, to the effect that the word "Madzoon" includes, in Armenia, the liquid or semiliquid form of the article in question. The careful re-examination of the proofs which the complainant has called on us to make, leads us to doubt this conclusion, even as against some early state ments of the complainant, much relied on by the respondents, as well as by the learned judge who sat in the circuit court. It is now maintained by the complainant that the liquid form of the Armenian production is locally known as "Taan" or "Tann," and the solid form as "Madzoon," and that therefore, inasmuch as he applies the word "Matzoon" to a liquid substance, it must in any event be taken to be a word symbol, as stated in his application for the registration of his trade-mark. The testimony of those witnesses who may be said to have absorbed most thoroughly the knowledge of Armenian domestic manners and customs favors this proposition. Mr. Bliss, for example, who was born in Erzeroum, and resided there as a child, thus at an age when the mind is most impressionable, and afterwards for years in Constantinople, with frequent journeys throughout the whole of ancient Armenia, fully sustains this proposition. He says that Matzoon is "a preparation of milk curdled, and having much the consistency and general appearance of a custard or blancmange; not unlike," he adds, "what is known as 'bonnyclabber,' only with a little more solidity than bonnyclabber." He gives the Armenian root of the word "Matzoon," which is defined as "curd," "clot," and he states that the transitive verb with the same root is translated as follows: "To solder; to glue; to conglutinate; to cement; to fasten; to join; to curdle; to make coagulate; to thicken; to congeal." This going back to the root is particularly suggestive. He also says that the Armenians, in describing the use of "Madzoon," never speak of drinking it, but always use the verb "to eat," and, in substance, that the only thing which in Armenia represents the complainant's preparation is what the Armenians call "Taan." This, however, he says is a preparation of Madzoon "beaten up and then diluted with water, and used as a beverage."

The careful testimony of such well-known gentlemen as Dr. Hamlin and Dr. Washburn, each of them at some time president of Robert College, is to the same effect, although the general terms of some of their letters lead to a different conclusion. It is to be noted, however, that in substance "Taan" and "Madzoon" are the same thing; the former being only the diluted form of the latter, there being no chemical nor molecular differences between them. All this, however, whatever may be the facts on this issue, as well as the claim made by the complainant's bill, which we have stated to be the third matter in reply, that the complainant's article now on the market is "a new article of manufacture," are clearly met by a proposition of law which we will state, and by the facts which make this proposition applicable.

The most important underlying principles of the law of trademarks, in their modern development, are largely ethical, and it is well settled that the rule that one who seeks equity must come into court with clean hands is peculiarly applicable to a complainant in a suit of the class at bar. For illustration, so far as the rule condemns misrepresentations as to the nature or origin of articles made in, or in connection with, the trade-mark by the aid of which the articles seek a market, it is sufficient to refer to Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706; Church v. Proctor, 13 C. C. A. 426, 66 Fed. 240; Syrup Co. v. Putnam, 16 C. C. A. 376, 69 Fed. 740; and Leather-Cloth Co. v. American Leather-Cloth Co., 11 H. L. Cas. 523, affirming the views of Lord Westbury hereafter referred to. The rule is not limited to misrepresentations made by the trade-mark itself, but it covers whatever is substantially calculated to deceive the public if used in such connection that it became one of the essential forces which made the trade-mark successful. A comprehensive statement of the rule was made by Lord Westbury in Leather-Cloth Co. v. American Leather-Cloth Co., 4 De Gex, J. & S. 137, 142, as follows:

"When the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not, in his trade-mark, or in the business connected with it, be himself guilty of any false or misleading representation; for, if the plaintiff makes any material false statement in connection with the property he seeks to protect, he loses, and very justly, his right to claim the assistance of a court of equity."

This citation from Lord Westbury is accepted by the latest authority (Sebastian's Law of Trade-Marks [1899] at page 207), and the rule is so well settled that there can be no doubt on this score. As, therefore, the general rule requiring clean hands applies both to the trade-mark and to its relation to the business connected with it, it follows that what is said in Sebastian's Law of Trade-Marks at page 65 is, with proper limitations, applicable to representations made in the business, although what is there said relates by its terms only to what appears in the trade-mark itself. The author says:

"An attempt has occasionally been made to meet the contention that a word claimed as a trade-mark is incapable of appropriation by reason of its descriptiveness, by the allegation that the goods to which it is applied do not answer

the description imported by the word, and therefore that the word is not in fact descriptive of the goods. But, in cases where a word is used which is descriptive of qualities which the goods might reasonably be supposed to possess, if the goods do not possess those qualities the use of the word is deceptive, so that quacunque via the claim fails."

The same rule is repeated by the same author at page 350, in connection with his explanation of the English patents, designs, and trade-marks acts of 1883 and 1888. It is to be noted in this connection that the court is not bound to inquire whether or not the representations are false, in the obnoxious sense of the word, because it is sufficient that they are in their nature misleading, if they are also material, and do in fact mislead. Indeed, that the public are equally prejudiced by deceptive statements in a trade-mark, or in connection therewith, whether the purpose of its owner was fraudulent or not; that therefore the equity courts have no occasion to inquire into his secret intents; and that such courts will not protect a business built up as the result of deceptive representations, whatever were those secret intents,—are such fundamental rules in the law of trade-marks that we have no occasion to elaborate them, or to cite authorities in reference to them, except so far as proper to illustrate them; and the case at bar runs clearly counter to these rules, whatever may be the proper transliteration of the Armenian word, and whether or not the article which the complainant has been selling is in substance the same as the product commonly known in Armenia as "Madzoon," or whether or not, as alleged in the complainant's bill, it is "a new article of manufacture."

As we have already said, the application for the complainant's registered trade-mark was filed on August 7, 1885. He stated in it that he had used the trade-mark in his business since on or about July 17th of the same year. There are in the record various circulars and labels, put out by the complainant with reference to the nature of the preparation spoken of in his application, and to the character of the business which the bill at bar seeks to protect. These are not all of the same positive description, and, indeed, some of the later of them do not come within the line of observations which we are compelled to make with reference to the earlier. In this connection we do not rely on the statements made by the complainant to the New York Academy of Medicine in June, 1885, referred to in the opinion of the learned judge of the circuit court. We need only refer to one circular and one label. The dates when these were put out are not shown by anything to which our attention has been called, except that it is admitted by the complainant in argument that the label was issued about the time he introduced his preparation into the United States in 1885. What is styled in the record "Label No. 1" included the trade-mark as registered, and also contained explanatory notes, of which we need read only the following: "Matzoon is a fermented milk food in the liquid condition, and used extensively in Armenia and Asia Minor as a refreshing beverage and invalid's food."

In the circular, appears the following: "Matzoon, or Fermented Milk Food." Underneath this is the picture of Mt. Ararat, accom-

panied with the words, "Trade-mark registered;" thus putting beyond all doubt that this circular connected itself with the trademark in issue here. Then follow the words, "Prepared by Markar G. Dadirrian, M. D.;" describing him as a graduate of the New York University Medical College of 1871, and also as a resident and practicing physician for many years in Constantinople and Asia Minor, thus giving the public to understand that he had proper means of knowledge of the matters whereof the circular speaks. The circular then proceeds as follows:

"This preparation of milk originated in Armenia, around Mt. Ararat, and extended thence to distant countries in Asia Minor, etc. It is used in those countries largely as food, and as medicine in every form of febrile diseases," etc.

It further adds:

"In Asia Minor and Arabia," etc., "the inhabitants, during the season of intense heat, both within doors and under the sun, resort to Matzoon to allay their burning thirst, instead of using beer, soda water, lemonade, ices, and the like, and find unequaled refreshment therefrom. They also drink freely of it while enjoying the luxury of the Turkish bath."

Further on the circular says:

"Matzoon is prepared in two forms, liquid and solid. The liquid form is used mostly for the sick, though frequently also as a beverage by those in health. The solid is used mostly as food, and as a dessert at the table."

Then ensue some further commendations of the preparation, which conclude by asking for it a trial, accompanied with this expression:

"With great confidence in its value, based upon a personal experience in its use during three years in Asia Minor, ten years in Constantinople, and considerable time in New York, and from observing its usefulness in the hands of eminent American, German, and French physicians in Constantinople."

This circular contains extracts from letters from Dr. Hamlin and Dr. Van Lennep, an eminent American missionary, confirming the statements made by the complainant; the letter from Dr. Van Lennep addressing itself to the great biblical and missionary side of the people of the United States, as follows:

"I am glad to learn that you are introducing into this country the celebrated Oriental 'fermented milk food' called 'Matzoon.' The Arabs set so high a value upon it that they hold a tradition that an angel was sent from heaven to reveal the secret of this preparation to their father, Abraham; and they drink no water, but their favorite Matzoon instead, which stands night and day in a large dish near the entrance to the tent."

The biblical and missionary sentiment thus appealed to was sought to be further interested by letters from the eminent Rev. Dr. Howard Crosby and the eminent Rev. Dr. John Hall, appended to the circular, commending in a general way the complainant and "Matzoon."

Presumably, this label and this circular, with the matters appended to it, accomplished their evident purpose, and were among the principal means of securing the introduction of the complainant's preparation into the United States, and of creating the business which he now asks the court to protect. Indeed, the record shows sufficiently that it was a thorough belief of, at least, some part of the medical profession in the United States, that complainant's

preparation was the wholesome drink used in Asia Minor, which has given it, not only a place in the market, but in the United States Dispensatory. This early information which Dr. Dadirrian gave the public denied in advance the positions now taken, to the effect that "Matzoon" is not "Madzoon," that "Madzoon" is exclusively a solid preparation, and that what Dr. Dadirrian offers is "a new article of manufacture." We state this conclusion without intending to pass judgment on any question of the complainant's integrity, and without refusing to accept the explanations made at bar, because a business based on a trade-mark which the equity courts are asked to protect cannot, as we have said, be built up in this way. The result is the dilemma stated by Mr. Sebastian in his work already cited, at page 351, omitting his reference to particular provisions of statute which are not necessary for this purpose, as follows:

"The applicant is in the dilemma that the alleged trade-mark is either descriptive or deceptive. If the word or words are properly applicable to the article, and may be truly used with respect to it, they are descriptive. If they may be read as stating something with respect to the article which is untrue, they are deceptive. So that quacunque via the application must fail."

It was said in the opinion of the learned judge who sat in the circuit court that the label of the respondents below is so different in appearance from complainant's that no relief could be granted on the ground that the ordinary purchaser is likely to be deceived, or of unfair trading. There is much evidence tending to show that purchasers at times mistook what was offered on the market by the respondents for that of the complainant, but that such misunderstandings should occur to some extent arises inevitably from the nature of the trade-mark in issue here. There was also evidence of unfair dealing; but that arose rather from personal representations made by the respondents in particular instances than from any simulation of the complainant's merchandise, and it is not the purpose of this suit to remedy matters of that nature.

Aside from the question of an absolute right to a monopoly of the alleged trade-mark in issue, inasmuch as the complainant introduced into the market of the United States the foreign article which it represents, and had held that market exclusively for so many years that the article became known to the public as his article, the principle underlying the rule announced in Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, applies. So, also, cases like Reddaway v. Banham [1896] App. Cas. 199, where, to a certain extent, what is called a "secondary use of a generic term" has been protected, are not to be overlooked. It may be well to add that the rule of Reddaway v. Banham is explained somewhat in Cellular Co. v. Maxton [1899] App. Cas. 326, 336,—the latest case on the topic. Singer Mfg. Co. v. June Mfg. Co. and Reddaway v. Banham are, after all, essentially of the same class; so that, as to each, it may be said that it is well settled that, while a trade-mark of a descriptive character cannot be monopolized as such, yet there may be such circumstances that subsequent users are bound to distinguish their merchandise, and may be restrained unless they couple with the use of the generic name some caution suitable to guard the

public from confusing the sources of production. In the case at bar it is alleged in the bill on this point that the respondents had put up their product in pint bottles, identically the same in shape and color as those used by the complainant, and had also used white labels, as does also the complainant. These are the only particulars as to which the bill describes simulation. The bottles of the complainant, however, are common pint bottles in use everywhere; and the exhibits produced to the court do not show labels whose color would be mistaken by the ordinary public as that of the white ones in use by the complainant. The complainant has throughout used on his label a picture of Mt. Ararat; being, for the eye of the purchaser, the most prominent feature which it contains. This was omitted by the respondents in their labels. Not only in this respect, but in others, theirs are distinguished in such marked manner from those of the complainant that, as we have already said, the public has a reasonable warning of the difference in the sources of production, although, as we have suggested, the article itself had been so long exclusively combined in the public mind with the complainant that little less than personal explanations would in many cases prevent the purchaser from deceiving himself. All that can be claimed of the respondents in this particular is that they conform to the rule of Singer Mfg. Co. v. June Mfg. Co.; and the complainant has not suggested to the court, and the court is unable to perceive from its own inspection of the exhibits, what the respondents could do, more than they have done, to perform their obligation in that respect. Centaur Co. v. Marshall (C. C. A.) 97 Fed. 785, 789. We are speaking here only of the exhibits which were brought to our attention. It was said orally that, at a hearing in the circuit court on a motion for a preliminary injunction, packages put on the market by respondents were produced, showing similitude to the complainant's article of merchandise in such particulars that, on suggestion by the court, respondents adopted new labels; but this matter was not brought out clearly, and our adjudication must, of course, depend on what was exhibited to us. On consideration of those exhibits, it is clear that the learned judge of the circuit court was correct in holding, as we have already said, that the respondents' label is so different in appearance from complainant's that no relief can be granted on this phase of the case.

The decree of the circuit court is affirmed, and the costs of the appeal are awarded to the appellees.