**DONALD F. DUNCAN, INC., Plaintiff-Appellee,**

v.

**ROYAL TOPS MANUFACTURING COMPANY, Inc., and Randy Brown, Defendants-Appellants.**

No. 14575.

United States Court of Appeals Seventh Circuit.

March 3, 1965.

Rehearing Denied May 4, 1965. En banc.

See also 7 Cir., 343 F.2d 669.

Stanley M. Cahn and Cummings & Wyman, Chicago, Ill., for defendant-appellant Randy Brown.

Maxwell E. Sparrow, Mark H. Sparrow and Sparrow & Sparrow, New York City, for defendant-appellant Royal Tops Mfg. Co., Inc.

Owen J. Ooms, Chicago, Ill., for plaintiff-appellee, Roy A. Lieder, Gravely, Lieder & Woodruff, St. Louis, Mo., of counsel.

Before SCHNACKENBERG, KNOCH and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This action was brought by plaintiff (appellee) against defendants[1] for alleged trademark infringement of its registered trademarks, "Yo-Yo," "Genuine Duncan Yo-Yo" and "Butterfly," unfair competition, false representation of goods and unauthorized use of plaintiff's trademarks. Defendants by answer denied all allegations of the complaint relevant to plaintiff's claim for relief.

Following a lengthy trial, the Distict Court entered its findings of fact, conclusions of law and a judgment order in favor of plaintiff, from which defendants appeal.

While numerous contested issues are argued in this Court, we think the principal ones arise from plaintiff's contention (1) that defendants by reason of a license agreement entered into between plaintiff and Royal are estopped to deny the validity of the trademarks, and (2) that defendants by reason of a consent decree to which plaintiff and Royal were parties are bound under the doctrine of res judicata to recognize their validity. Only if issues (1) and (2) are decided adversely to plaintiff do we reach defendants' contention that plaintiff's trademark "Yo-Yo" is invalid as a generic and descriptive name.

On July 23, 1948, plaintiff's predecessor (a co-partnership) entered into an agreement with Louis Marx & Company, Inc. and Charmore Company, whereby the licensor granted them a license to use the trademark "Yo-Yo." The agreement

---

1. Defendant Royal Tops Manufacturing Co., Inc. will be referred to as "Royal," and defendant Randy Brown as "Brown." Where both defendants are referred to, it will be as "defendants."

provided that "should Marx abandon the manufacture or/and sale of the bandalore types of toy spinning tops, manufactured and sold by it, then Duncan shall have the right to cancel the license granted herein upon thirty (30) days' notice in writing given to Marx."

In 1951, Royal's predecessor brought an action for declaratory judgment in the District Court for the Northern District of Illinois, by which it sought a cancellation of plaintiff's registration, "Yo-Yo," on the ground that it was the generic or a descriptive name of the article upon which it was used. Brown was not a party to this action.

On September 14, 1955, plaintiff entered into a license agreement with Royal by which it granted to Royal "an exclusive and non-transferable right to use Licensor's trade-mark, 'Yo-Yo,' on or upon or in association with bandalore tops." This agreement provided, "The parties hereto agree that they will enter into appropriate papers in the United States District Court in the aforesaid litigation [referring to the action for declaratory judgment] wherein said trade-marks shall be held to be valid and existing."

On November 21, 1955, a consent judgment was entered which found plaintiff to be the owner of the trademark registrations for "Yo-Yo" and for "Genuine Duncan Yo-Yo." The judgment recited, "Each of the above trademarks is applied and used in connection with a disc-shaped top manipulated up and down on a string, more commonly known as a bandalore top or quiz." The judgment determined that the trademarks "are valid."

On September 6, 1961, plaintiff's attorney directed a letter of cancellation to the Marx and Charmore Companies, the licensees named in the 1948 license agreement stating, "Please consider this letter as the thirty-days' written notice." This notice was given as required by a provision contained in that agreement.

We need not cite or discuss cases which support the general rule that a trademark licensee is estopped to dispute validity or that a consent decree, the same as any other decree, is binding on the parties. Royal contends that these rules are not applicable because plaintiff, as an inducement for the 1955 license agreement, fraudulently represented that there was no outstanding license agreement when as a matter of fact it knew or should have known the 1948 agreement with Louis Marx & Company, Inc. and Charmore Company was in force and effect. In any event, Royal argues that the license agreement was invalid because of a mutual mistake as to a material fact and that the consent decree was entered as a result of and as provided for in the license agreement and was, therefore, tainted with the same fraud or mutual mistake.

Plaintiff's response to these contentions is based upon a finding by the District Court, "This license [referring to the 1948 license to Marx and Charmore] was cancelled by mutual agreement in 1952," and "Correspondence between Marx and plaintiff indicates an acknowledgment of the cancellation of 1952." In our judgment, these findings as well as the argument predicated thereon are clearly erroneous and must be rejected.

Plaintiff in support of its cancellation theory relies upon the testimony of Donald Duncan, Sr., that the license was cancelled in 1952 by mutual agreement in a conversation with Marx. Admittedly he gave no thirty-day written notice of cancellation as required by the Duncan-Marx agreement. Nor was such a notice given until 1961, when it was given by plaintiff's attorney. Plaintiff attempts to bolster its contention on this score by inferences drawn from correspondence between Duncan and Marx following the alleged oral cancellation. An examination of this correspondence as a whole completely negates the inferences which plaintiff professes to discern. For instance, on July 14, 1961, the attorneys for Marx wrote plaintiff, stating, "Our client is licensed by you to use the name 'Yo-Yo' as provided in the 1948 agreement." On July 26, 1961, Marx wrote plaintiff, "We have an agreement to that effect (our right to use the name 'Yo-Yo') giving us full permission to use it."

(This is the same Marx with whom Duncan claimed to have had the oral agreement of cancellation in 1952.)

Even after plaintiff's counsel gave written notice of cancellation in his letter of September 6, 1961, Marx was still contending that its 1948 agreement with plaintiff was in effect. In response to the written notice of cancellation, the attorneys for Marx wrote that they " * * * consider this attempted. cancellation to be without validity or effect." It may be that when plaintiff's counsel gave written notice of cancellation in 1961, he was without knowledge of the alleged oral cancellation in 1952, or if he had such knowledge, recognized it as futile. In, this connection it is pertinent to note that Donald F. Duncan, Jr., plaintiff's president, testified that to his knowledge the 1948 agreement with Marx and Charmore had not been cancelled and was still in full force and effect in 1955, when the license agreement was entered into between plaintiff and Royal.

■ Thus, the conclusion is inescapable that the 1948 license agreement between plaintiff and Marx and Charmore was in full force and effect at the time plaintiff entered into a license agreement with Royal and granted to it "an exclusive" right. Royal's president, Joseph T. Radovan, testified that he would not have settled Royal's suit against plaintiff for declaratory judgment if he had known there was an outstanding license agreement with some other company. The most charitable characterization which can be made of plaintiff's misrepresentation is that it was a mutual mistake, relied upon by Royal to its prejudice. The license agreement relied on is, therefore, invalid. General Finance Corp. et al. v. Keystone Credit Corp. et al., 50 F.2d 872, 878 (4th Cir.); Almon Heath v. A. B. Dick Co., 253 F.2d 30, 35 (7th Cir.); Foster v. Carlin, 218 F.2d 795, 801 (4th Cir.).

■ Furthermore, plaintiff, on June 28, 1961, gave Royal formal notice of cancellation of the license agreement, and it has been held that an estoppel by a licensee to deny the validity of licensor's trademark expires with the license. Bucky et al. v. Sebo et al., 208 F.2d 304, 305; Eskimo Pie Corp. v. National Ice Cream Co., 6 Cir., 26 F.2d 901, 902.

■ Plaintiff's contention relative to res judicata is based on the fallacious contention, as stated on brief, that "as a result of that decree—1955 consent decree—an agreement—license agreement between plaintiff and Royal—was entered into." The Court embraced this error by finding, "Pursuant to that decree [1955 consent decree] a license agreement was entered into in which Royal Tops' predecessor was given the right to use the trademark 'Yo-Yo' * * *." Both the contention and the finding are manifestly erroneous. The consent decree was entered into as a result of and pursuant to the license agreement rather than vice versa. The latter was entered into September 14, 1955, and the former November 21, 1955, more than two months later. Moreover, the license agreement, as previously shown, expressly provided for the entry of the consent decree.

■ During the pendency of the action for declaratory judgment and after the parties had expended much time and effort in preparation for trial, plaintiff proposed to Royal that it would grant an exclusive license on the condition that Royal recognize the validity of plaintiff's trademark, which was done by the license agreement, later embodied in the consent decree. Thus, the consent decree inherited all the infirmities of the license agreement. In our judgment, it furnishes no legal basis for an application of the doctrine of res judicata.

Our discussion so far relative to license estoppel and res judicata has pertained to defendant Royal. What we have said applies with even greater cogency to defendant Brown, who was not a party to the 1955 license agreement between plaintiff and Royal or to the action between those parties which culminated in the declaratory judgment. In fact, at the time of the entry of the judgment, as well as the execution of the license agreement, Brown was an employee of

plaintiff and did not become associated with Royal until some five years later. Plaintiff on brief states, "In the instant case, Brown, as an agent of Royal Tops, derived his right to sell return tops under the trademark 'Yo-Yo' through the license which plaintiff has granted to Royal Tops. Thus, like defendant Royal, he is subject to licensee estoppel. Furthermore, Brown and Royal Tops have an identity of interest in the validity of the trademark 'Yo-Yo.' Since this question was previously litigated by Royal Tops, it precludes Brown from attacking the validity through the doctrine of res judicata."

■■ Whether Brown subsequently became an agent and therefore in privity with Royal is a much controverted issue which need not be resolved at this point. Assuming for our present purpose that such relationship existed, it is not discernible how licensee estoppel could be invoked against him by reason of a license to which he was not a party and which was entered into with Royal some five years previously. It is even more far-fetched to conclude that he was bound by the consent decree entered in an action to which he was not a party, in which he had no interest and no right to be heard, even had he so desired. None of the cases cited on the controverted issue as to whether Brown became the agent of Royal supports the contention that he is estopped by reason of the license with Royal or by the consent judgment to raise the question as to the validity of the trademark "Yo-Yo." Particularly is this so in view of our conclusion that the doctrines of estoppel and res judicata are not applicable to Royal.

This brings us to the crucial issue of defendants' alleged infringement of plaintiff's trademarks. In support of their contention on this issue, defendants argue that the trademarks were improperly issued and, therefore, invalid on the ground that "Yo-Yo" was and is a generic term, not amenable to valid registration. This argument embodies a twofold theory: first, that "Yo-Yo" was the name of a toy in the Philippines prior to the manufacture of the toy in 1929 by plaintiff's predecessor, and that when introduced in this country it was adopted into the American language as descriptive; and second, that the word "Yo-Yo" at the time of the trademark registrations was generic or has subsequently become so.

■ An exhaustive study of the record and the cases leads us to the firm conclusion that plaintiff's trademarks were improperly registered and, therefore, invalid, or in any event that they have subsequently become such by reason of the general acceptance by the public of "yo-yo" as a descriptive name for the toy.[2]

Obviously, it would unduly burden this opinion to review this voluminous record in detail, but we feel obliged to state the basic reasons for our conclusion. As noted, plaintiff commenced the manufacture of its toy in 1929. On November 1, 1932, Donald F. Duncan, Sr. obtained registration for his trademark "Genuine Duncan Yo-Yo," which was shortly thereafter assigned to plaintiff, and on January 24, 1933, plaintiff obtained registration for its trademark "Yo-Yo." Each of these trademarks was for a toy of the bandalore type. Royal Tops Manufacturing Company, a predecessor of defendant Royal, commenced the manufacture of the same type of toy in the United States in 1937, applying at that time the word "yo-yo" to the packages containing the toys.

Plaintiff in meeting the issue of invalidity places great stress upon two universally recognized principles for which we need cite no authority: (1) that the findings of the trial court are to

2. Plaintiff in its promotional literature and otherwise used its trademark "Yo-Yo" (in capital letters) and "yo-yo" (in lower case letters) interchangeably. The terms were thus employed in the District Court and in the briefs filed in this Court. We think there is no basis to distinguish the terms insofar as they relate to the name by which the toy is known to the public, and in this opinion we have made no attempt to do so.

be accepted unless clearly erroneous, and (2) that trademarks are presumed to be valid. In this connection plaintiff also places much reliance upon a contention that "Yo-Yo" is an arbitrary mark, a word which originated with Donald F. Duncan, Sr., and coined by him. No finding was made by the trial court on this point and, for reasons subsequently shown, we think the contention is fallacious.

Joseph Radovan, president of defendant Royal, an American of Philippine extraction, testified that he was born in the Philippines in 1909, resided there until after his graduation from high school, when he came to this country; that "yo-yo" was a Filipino game, a major children's pastime as early as he could remember; that the toy was never called by any name other than "yo-yo" in the Philippines; that "yo-yo" is a Filipino word in all dialects; that after he came to this country in 1931, he and other Filipinos worked for plaintiff's predecessor as "yo-yo" demonstrators until 1937, when he quit to form defendant Royal's predecessor.

We recognize that this witness was an interested party and that it is not our function to weigh the evidence but, as we shall show, his testimony is so thoroughly and completely corroborated that in our view there is no sound basis for its rejection. In the first place, it is convincingly corroborated by a statement made by Donald F. Duncan, Sr., during the pendency of the proceeding in the Patent Office for registration of the trademark "Yo-Yo." On July 22, 1930, Flores Yo-Yo Corporation obtained registration of the trademark "Flores Yo-Yo." The first application of Duncan, Sr. was rejected by the Patent Office examiner because of the trademark "Flores Yo-Yo." In response to this rejection, on December 19, 1931, Duncan, Sr. argued as follows:

" * * * the applicant understands the term 'Yo-Yo' is used in the Philippine Islands to mean 'come back' or 'springy'; and as the term was applied to the bandalore type of toy because it appears to be springy and comes back, there is a question as to whether or not this term alone, if presented for registration, would not be held descriptive. Under this reasoning, it is assumed that the only feature common to the two marks embodying registrable matter is the term 'Yo-Yo' which, if descriptive, is incapable of exclusive appropriation and use by either the applicant or the registrant.

* * * * * *

"The reference cited has been noted, but it is believed that the mark therein disclosed is merely 'Flores Yo-Yo', as distinguished from 'Duncan's Yo-Yo' or 'Genuine Duncan's Yo-Yo'."

Thus, not only did the applicant recognize that "Yo-Yo" was then in use in the Philippines as the name applied to a toy, but also the probability that it was a generic term incapable of exclusive appropriation. It is of more than ordinary significance that Duncan, Sr., while a witness for the plaintiff in the instant proceeding, was not asked to explain this statement, and he did not deny that at the time his applications were being processed he had the information which he then represented to have. This statement to the Patent Office, together with the previous registration of "Flores Yo-Yo," in itself dispels any idea that "yo-yo" was a word coined by or originating with Duncan, Sr. It is pertinent to note that after the rejection of the first application of Duncan, Sr., he (or plaintiff's predecessor) acquired by assignment, presumably by purchase, the Flores registered trademark. It was after this that plaintiff's predecessor succeeded in obtaining its "Yo-Yo" registration.

Defendants introduced the testimony of Dr. Henry Lee Smith, Jr., since 1956 Chairman of the Department of Anthropology and Linguistics and Professor of Linguistic English, State University of New York at Buffalo, who qualified as an expert linguist and etymologist, particularly in the Polynesian languages. No question was raised as to the qualifications or integrity of this witness. He

testified that at the request of counsel for defendants, he made a special study of the word "yo-yo," and that in connection with that study he consulted, in addition to the documents introduced by plaintiff, major unabridged encyclopedias, current unabridged dictionaries, various bibliographical references, and with colleagues and children. As a result of his study, he expressed the definite opinion that the word "yo-yo" is a Malayo-Polynesian word of Philippine origin; that the toy itself is of Oriental origin, and that the word "yo-yo" was tied together with the toy in the Philippines and was introduced into the American language from that country. His testimony was buttressed by numerous documentary references, one of which was an article appearing in The Sunday Tribune Magazine of March 5, 1933, entitled, "Is Yo-Yo from the Philippines," which quotes the assistant director of the Philippine National Library as saying that the word "yo-yo" is descriptive of the movement and sound of the toy and hence the toy is characteristically so called in Filipino languages. Further, the article states that "Yo-Yo" is a game known throughout the entire archipelago, where it is consistently used in a generic sense.

Another document introduced by defendants and discussed by Dr. Smith is an article appearing July 1, 1916, in the Scientific American Supplement, entitled, "Filipino Toys." One of the toys shown is a "yo-yo," which the article illustrates and describes in detail. It states, " * * yo yo, however, are names very generally used throughout the islands." This article was published some fifteen years prior to registration of plaintiff's trademarks.

Patent No. 1,806,485, issued May 19, 1931, on a "musical toy," in its specifications describes "Yo-Yo" as a top in ten different places.

Plaintiff argues that the proof fails to establish that "Yo-Yo" is a word of foreign origin, used in the Philippine Islands as the generic name of the toy, relying chiefly upon the presumption of validity which attached to the allowance of the trademarks. With this contention we do not agree. In our judgment, the proof shows that the toy, long before it was introduced in this country, was in use in the Philippines and that its generic name was "yo-yo."

Defendants, in support of their contention that a word adopted from a foreign language and descriptive in that language cannot be legally appropriated as a trademark, rely upon Selchow & Righter Co. v. Western Printing & Lithographing Co. et al., D.C., 47 F.Supp. 322, 325, affirmed 7 Cir., 142 F.2d 707, cert. den. 323 U.S. 735, 65 S.Ct. 75, 89 L.Ed. 589; Holland et al. v. C. & A. Import Corp. et al., 8 F.Supp. 259, 261, and Dadirrian v. Yacubian, 1 Cir., 98 F. 872, 874.

In Selchow, this Court held that the owner of the trademark "Parcheesi" was not entitled to an injunction against the use by others of the word "Pachisi" since the latter was the Indian name of the Indian game. The District Court in that case quoted with approval the language of the Court in Selchow et al. v. Chaffee & Selchow Mfg. Co., 2 Cir., 132 F. 996, 1000, as follows (47 F.Supp. page 325):

> "The one who first introduces a foreign game or article under its true name cannot monopolize either the game or the article or the name thereof * * *."

Plaintiff seeks without avail to distinguish Selchow on the basis that it was an agreed fact that the word used to describe the game in this country was the phonetic equivalent of the name of the game in India. The case here is even more in point because the name given the toy in this country was the same as that proven to have been used in the Philippines.

In Holland, citing Dadirrian, the Court stated (8 F.Supp. page 261):

> "By the weight of authority, a word commonly used in other countries to identify a kind of product and there in the public domain as a descriptive or generic name may not be appropriated here as a trade-

mark on that product, even though the person claiming the word was the one who introduced the product here and the word then had no significance to our people generally."

While we conclude that "Yo-Yo" is a word which originated and was used in the Philippine Islands as the generic name of the toy and that the registration of such descriptive term was improper, we think we should not rest our decision solely on that basis. Assuming, therefore, contrary to what we think, that the marks were properly registered, there remains the issue as to whether "Yo-Yo" in use became known to members of the public as the descriptive name of the toy.

Evidently in recognition of the fact that the term "yo-yo" had long since passed into the public domain, plaintiff in 1955, more than twenty years after the trademark registrations, commenced a widespread campaign to characterize the toy with the generic term, "return top." Thus, the issue as made and tried was whether the generic name of the toy was "Yo-Yo," as claimed by defendants, or "return top," as claimed by plaintiff. Plaintiff has made a herculean effort to fasten upon the toy the generic term, "return top," as is evidenced by the many—perhaps hundreds—of times which the term is employed in its pleadings and in the Court's findings which were submitted by plaintiff. We shall refer to two findings as typical.

The Court found:

"Plaintiff has been engaged in the manufacture and sale of toys, including *return tops*, since at least January 1929 and is the owner of United States trademark registration No. 300,504 for the trademark Yo-Yo for *return tops* (renewed on January 24, 1953 under the Trademark Act of 1946), United States Trademark Registration No. 298,697, Genuine Duncan Yo-Yo, for *return tops* (renewed November 1, 1952 under the Trademark Act of 1946) and United States Trademark Registration No. 685,842, Butterfly, for *re-*

*turn tops,* issued on September 29, 1959. [Italics supplied.]"

Another finding:

"The *return top* has been known for so many hundreds of years that its real origin is lost in antiquity. Through these years this toy has been known by a variety of generic terms such as bandalore, emigrette, quiz. [Italics supplied.]"

The misleading nature of these and other findings is that plaintiff's trademarks were not for "return tops" and its toys were not manufactured and sold under that name, at least until subsequent to 1955. If there is any proof, and we find none, that the return top has been known for hundreds of years, the point is that the term was not employed by plaintiff as descriptive of its product until recently.

The documentary proof we think is conclusive on this point. The trademark, "Flores Yo-Yo," which plaintiff acquired by assignment, was for "Toys Of The Bandalore Type And Strings As Replacement Parts For The Same." Plaintiff's trademarks, "Genuine Duncan Yo-Yo" and "Yo-Yo" were for "Bandalore Type Spinning Tops."

The 1945 license agreement between plaintiff and the Marx and Charmore Companies (heretofore discussed) recites, "Duncan is the owner of the Trade Mark 'Yo-Yo' for Bandalore Toy Spinning Tops," and grants to the licensees the right to use plaintiff's trademarks "in connection with bandalore toy spinning tops." The pleadings in the action for declaratory judgment instituted by Royal against Duncan in 1951 are not before us, but a finding entered in that case, upon which the consent judgment was entered on November 21, 1955, referring to Duncan's trademarks states, "Each of the above trade marks is applied and used in connection with a disc-shaped top manipulated up and down on a string, more commonly known as a bandalore top or quiz." The license agreement between plaintiff and defendant Royal (heretofore discussed), entered September 14, 1955, granted to the latter "an

exclusive and non-transferable right to use licensor's trade-mark, 'Yo-Yo,' on or upon or in association with bandalore tops."

It is strange indeed that the return top so long known, as the Court found, was never mentioned in any of these documents as the name for plaintiff's toy.

Donald F. Duncan, Jr., plaintiff's president, as a witness in effect admitted that "yo-yo" was a descriptive term for its toy. On cross-examination he testified:

"Q. In your literature, you call it a yo-yo; do you not?

"A. I suppose at times we have, yes.

"Q. You have. In other words, the article that you described to us is also known as a yo-yo?

"A. I wouldn't say that, exactly.

"Q. What would you say exactly?

"A. The article we call a return top or yo-yo describes, I would say our product."

Duncan also admitted that plaintiff distributed order sheets which listed items under the description, "Junior Yo-Yo, Beginner's Yo-Yo, Tournament Yo-Yo, Satellite Yo-Yo, Butterfly Yo-Yo and Imperial Yo-Yo." This was done without any indication that "Yo-Yo" was a registered trademark.

There is much documentary proof, the authenticity of which is not in dispute, that plaintiff for more than twenty years employed the term "Yo-Yo" in its descriptive and generic sense. Its most publicized slogan used in trade magazines, on the radio, television and otherwise, was "If It Isn't a Duncan, It Isn't a Yo-Yo." "Yo-Yo" as thus used was generic and descriptive of plaintiff's toy. A similar use of "Yo-Yo" in its generic sense in communicating with large numbers of the consumer public was the recording of a song exhorting children to "Spin a Yo-Yo." This recording was plaintiff's theme song, used by plaintiff on a television program which was carried weekly.

In plaintiff's promotional material a "Yo-Yo" was described as follows:

"In case you do not know what a yo-yo is, it's that gaily colored little spool on a string, that in the hands of almost any youngster becomes a thing alive and performs hundreds of fascinating tricks. According to little Joe Radovan, present holder of World's Champion title, yo-yo had its origin in the Philippine Islands over 300 years ago and was used at that time as a weapon."

Order forms furnished by plaintiff to its jobbers stated:

" * * * the undersigned do hereby agree not to handle, sell or cause to be sold any yo-yo tops and yo-yo strings of any other make or manufacture than those of Donald F. Duncan, Inc., during the period extending from * * * ."

Defendant Brown testified that he had demonstrated, promoted and sold yo-yos and other toys continuously since 1930, when he was twelve years old, with an interruption only for military service, and that this long career carried him to almost every part of the United States and into Canada. He further testified that when he first started playing with yo-yos in 1930, he called the toys yo-yos, as did his grammar school classmates in Atlanta, Georgia; that over his years of experience as a demonstrator, promoter, campaign manager, buyer and seller of yo-yos, he came into contact with thousands of children, and that none of them ever referred to the toy, described or called it by any word other than yo-yo; that he has come into contact with thousands of people in the trade of buying and selling yo-yos or promoting the sale of yo-yos or running campaigns for yo-yo sales during his career, and that he has never heard any of these people refer to or describe the toy as anything but a yo-yo, "everyone says it is a yo-yo. They order yo-yos." The testimony of this witness is strongly supported by documents which he identified and discussed.

Tony Malcak, a disinterested witness, testified that he had served as Program

Director for the Catholic Youth Organization in the Chicago area for the past eight and one-half years; that during that period, four yo-yo contests, in each of which approximately 5000 children participated, were programmed; that he personally had come into contact with several thousands of children as Program Director for the CYO, from six years old to adult age; and that of these thousands of children with whom he had talked about the toy in question, none ever referred to it as anything but a yo-yo, and none ever called it a "return top." He further testified that his adult associates in the CYO, supervisors and secretaries, referred to the toy only as a yo-yo.

Testimony of witnesses offered by plaintiff bears little relevancy to the crucial issue for decision. James Clancy, engaged as a food manufacturer, after the commencement of the trial entered into a license agreement with plaintiff for use of the trademark "Yo-Yo" in connection with a new type of dog food. He testified that the trademark was a "terrific name" and "that he used the term 'return top' in England when he was a child, over fifty years ago." It is not discernible how this testimony is relevant to the issue as to whether "yo-yo" was the name by which the purchasing public knew and described the toy. Clancy's testimony is remarkable in that he knew the term "return top" fifty years ago, while plaintiff evidently had not heard of it at the time his trademarks were allowed and did not use it until twenty-five or thirty years later.

John H. Martin, engaged in the toy jobbing business, testified that he had always associated the term "Yo-Yo" with Duncan and had received many hundreds of orders for "yo-yos" which he filled with Duncan yo-yo return tops. Daniel A. Golman, another jobber, testified to the same effect. Recognition by jobbers that "Yo-Yos" were associated with and manufactured by plaintiff is no proof that the term was not known and used by the public in a generic and descriptive sense. In fact, the testimony of these jobber witnesses shows that the purchasing public identified the toy as "yo-yos" and ordered the toys by that name.

Plaintiff offered in evidence a number of letters, with replies thereto, in support of its so-called policing activities, designed to show that it made a proper effort to prevent the improper use of the trademark "Yo-Yo" by others. Most of this exchange of letters was subsequent to 1955, and during the time plaintiff was attempting to fasten upon its toy the name "return top" as a substitute for "Yo-Yo." This correspondence constitutes a two-edged sword and is of little help to plaintiff. Referring to the fact that competitors had been using plaintiff's trademark, its counsel in argument in the District Court stated, "As soon as we know about it, we write them a letter. They write us back and say, 'We thought it was generic.' " Illustrative is the response from Maxwell J. Perrotta, a patent lawyer of Providence, Rhode Island, who in a letter dated June 20, 1962 stated:

" 'Yo-Yo' is in our opinion clearly a generic term by which the product is now commonly known. The public is not now aware of what a 'return top' is, but they know what a yo-yo is. They do not recognize that yo-yos originate from a single source or have any other trademark significance."

The Court apparently recognized plaintiff's use of "Yo-Yo" in a descriptive sense and sought to excuse it. It found:

"It would be inequitable to forfeit Plaintiff's trademark rights because of the familiar use of the term Yo-Yo by Plaintiff's management when referring to toy. The Court takes judicial notice of the fact that many trade-marked items are casually referred to by their trade-marks alone, without a generic term."

This finding is akin to a plea in confession and avoidance. We do not agree that plaintiff should be excused from using "Yo-Yo" as the descriptive name for its product, thereby educating the public to treat it as such, because others might use their trademarks in the same manner.

Plaintiff, which has enjoyed a monopoly on its trademarks for more than twenty-five years, in our judgment should not be saved from a situation for which it in major part is responsible.

The Court found:

"The publisher of the Merriam-Webster Dictionary and the American College Dictionary have agreed to acknowledge Plaintiff's rights in the trademark Yo-Yo."

It is true that some of the dictionary publishers, at plaintiff's insistence, listed the term "Yo-Yo" as a trademark; however, all dictionaries, so far as we are aware, continued to treat the term as a noun, descriptive of a toy. Plaintiff on brief, in connection with its argument that "yo-yo" was not known in the Philippines because not listed in certain dictionaries, stated, "The place to find whether or not a word is a common noun is to look in the dictionary or other documents of record." Applying plaintiff's suggestion to the point under discussion, we find "yo-yo" generally and perhaps always listed as a noun, but no dictionary, so far as we are aware, lists "return top" as a noun or otherwise.

Plaintiff cites more than a dozen patents in support of its argument, "Since the registration of Plaintiff's trademark GENUINE DUNCAN YO-YO and Plaintiff's trademark YO-YO on November 1, 1932 and January 24, 1933 respectively, the U.S. Patent Office has, *in accordance with a general policy in these matters*, refused to permit the use of Plaintiff's trademark YO-YO as a generic term in patent applications relating to *return tops*. [Italics supplied.]"

We assume this is a correct statement as to general policy, which seems to mean only that one branch of the Patent Office seeks consistency with another. It is significant, however, that none of these patents describe the toy as a "return top," the generic name which plaintiff has belatedly sought to bestow upon it.[3] Moreover, and more important we think, neither the policy of the Patent Office nor the descriptive name accorded to the toy by patent applicants is of any probative value on the issue as to the descriptive name by which the toy is known to the purchasing public.

We now come to the much discussed survey introduced through the testimony of a single witness, Henry Gleiss, executive vice-president of Markoa Corporation. He testified that preparation of the survey questions was a "joint venture" with plaintiff's attorneys, and that the latter proposed the key survey question ultimately used, "What company do you think of as I mention each of these names?" The names listed in the interviewers' list were all well-known brand names, such as Band Aid, Coke, Erector, Jello, supplied to Mr. Gleiss by plaintiff's counsel. Among such names was listed "Yo-Yo." Without analyzing the result of this survey in detail, we think it sufficient to note that the composite result indicates that a total of 630 out of 1,445 interviewed (43%) associated the trademark "Yo-Yo" with plaintiff. None of the supervisors in charge of the survey, the interviewers or interviewees were called as witnesses.

■ Defendants contend that the result of this survey was inadmissible for various reasons, chiefly because it was pure hearsay and that the form of the questions called for biased answers. Plaintiff argues that the evidence was admissible under the "business records" exception to the hearsay rule. We think we need not be diverted by a discussion or a ruling on the question of its admissibility because, in our judgment, the evidence was immaterial and irrelevant to the main issue, that is, whether the generic and descriptive name of the toy was to the public "Yo-Yo" (or "yo-yo") or "return top."

The Court found, "The purpose of the Markoa Survey was 'to determine the as-

---

3. Some of the names by which the toy is referred to are "aerial top," "gravity-operated whirling toy," "spinning top," "tethered aerial top," "rotatable toy," "climber," "spinner," "jingle bell top" and "reciprocable top."

sociation of companies with a selected group of brand names.' This purpose was accomplished," and concluded that this was sufficient to establish secondary meaning.

Plaintiff argues that since "Yo-Yo" is an arbitrary mark, a theory which we have previously rejected, it "is not required to prove a secondary meaning in order to make out a prima facie case. It made the survey with full knowledge that Defendants' only asserted defense was that YO-YO was or had become generic, and to be in a stronger position to show —even though it is not under a burden to do so—that YO-YO is in fact associated with Plaintiff and is not generic." If plaintiff really desired to ascertain from a survey what the interviewees (members of the public) called or described the toy, we think questions could have been framed to obtain that result. For instance, the interviewees could have been shown an unmarked and unidentified toy and asked, "By what name do you call or know this toy?" Or, "Do you know this toy as a 'Yo-Yo' or a 'return top'?" Answers to these simple questions in all probability would have been decisive of the issue for decision.

▪▪▪ Assuming that the survey evidence was properly admitted and relevant to the crucial issue for decision, we think the Court erred in its finding and conclusion that plaintiff's trademarks acquired a secondary meaning because of "a significant association in the minds of a representative segment of the public between the trade-mark Yo-Yo and the name Duncan." Plaintiff in its complaint alleged that due to its extensive advertising, "the consuming public recognizes said trademark as identifying products originating with plaintiff and *no one else*." Plaintiff apparently has changed its stance as to the proof required to establish secondary meaning. On brief here it states, "There is no requirement in the trademark law that there be a showing that the consuming public associates a mark solely with Plaintiff," and "Secondary meaning of a trademark is amply demonstrated with significant association between the mark and the source." In support of this contention, plaintiff cites O'Brien v. Equitable Life Assur. Soc. of United States, 8 Cir., 212 F.2d 383, cert. den. 348 U.S. 835, 75 S.Ct. 57, 99 L.Ed. 658; Seven-Up Company v. Green Mill Beverage Co., D.C., 191 F.Supp. 32, and American Thermos Products Co. v. Aladdin Industries, Inc., D.C., 207 F.Supp. 9, affirmed King-Seely Thermos Co. v. Aladdin Industries, Inc., 2 Cir., 321 F.2d 577. We find nothing in these cases to support the contention.

Defendants argue that for a word to acquire secondary meaning in the minds of the purchasing public, it must have come to identify not the product but the producer. Among the cases cited in support of this contention is Selchow & Righter Co. v. Western Printing and Lithographing Co., et al., 47 F.Supp. 322, affirmed 142 F.2d 707 (C.A. 7), cert. den. 323 U.S. 735, 65 S.Ct. 75, wherein the Court stated that in order to establish secondary meaning in a trade name, it must be shown that "in the minds of the public, it means the producer rather than the product." See also Nissen Trampoline Co. v. American Trampoline Co., D.C., 193 F.Supp. 745, and Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, wherein the Court stated:

> "But to establish a trade name in the term 'shredded wheat' the plaintiff must show more than a subordinate meaning which applies to it. It must show that the primary significance of the term in the minds of the consuming public is not the product but the producer. This it has not done."

In our view, the survey evidence of a "significant association" between the trademark "Yo-Yo" and plaintiff did not establish secondary meaning, but in any event it constitutes no proof as to the generic name by which the public identifies the toy.

We have previously rejected certain findings of the District Court as being clearly erroneous. In view of what we have held, there are others which must be

rejected which we think need not be specifically enumerated. It is sufficient to state that any and all findings which support directly or indirectly the validity of plaintiff's trademark "Yo-Yo" are clearly erroneous and rejected. This includes those which find that "Yo-Yo" was not and had not become in the minds of the public the generic or descriptive name of the toy and that "return top" was or had become such a name.

We cite without extended discussion a few of the many cases which support our conclusion that "Yo-Yo" (or "yo-yo") was in the beginning or has become during the years the generic or descriptive name by which the public knows the product. First, there is the statutory provision, Title 15 U.S.C.A. § 1052 (e) (1), which provides that a word "when applied to the goods of the applicant is merely descriptive," and cannot properly be the subject of a valid trademark. In Bayer Co., Inc. v. United Drug Co., D. C., 272 F. 505, "Aspirin" was held to be the only name by which the public knew the drug, hence it was no longer the exclusive property of plaintiff; in DuPont Cellophane Co., Inc. v. Waxed Products Co., Inc., 2 Cir., 85 F. 2d 75, "Cellophane" was held to be the name which to the public ordinarily signified the cellulose product, hence it was no longer a valid trademark; in Dixi-Cola Laboratories, Inc. et al. v. Coca-Cola Co., 4 Cir., 117 F.2d 352, "Cola" was held not to indicate the plaintiff's product but a class of drink to which the goods of defendant and many other competitors belong, hence it was not capable of exclusive use by plaintiff; in Skinner Mfg. Co. v. Kellogg Sales Co., 8 Cir., 143 F.2d 895, "Raisin-Bran" was held to be descriptive of the breakfast food, hence it could not be appropriated as a trademark; in Nissen Trampoline Co. v. American Trampoline Co., 193 F.Supp. 745, "Trampoline" was held to be "completely generic" and invalid as a trademark, and in American Thermos Products Co. v. Aladdin Industries, Inc., 207 F.Supp. 9, affirmed King-Seely Thermos Co. v. Aladdin Industries, Inc., 321 F.2d 577, "thermos" was held to be generic and could be legal-

ly used by the defendant. The last two cited cases are particularly relevant to the instant situation. In Nissen, after finding that the term "Trampoline" had been generically used by authors and editors throughout the years and that they are still using it, the Court stated (193 F.Supp. page 749):

> "Plaintiff George Nissen actively promoted the generic use of the word 'trampoline' during the years he had a virtual monopoly in the commercial manufacture of this product. When his monopoly of the manufacture of this product was threatened, he became very active in promoting the use of the word 'Rebound tumbling' instead of 'trampoline' and was active in urging the NCAA and AAU to change the name of their gymnastic event from trampoline to rebound tumbling."

In American Thermos, referring to plaintiff's trademark, "Thermos," the Court stated (207 F.Supp. at page 17):

> "However, the fact that the word was being included in most dictionaries and the fact that the generic definition was occurring more and more often, evidenced the widespread growth of 'thermos' as a synonym for 'vacuum-insulated' in common usage particularly in connection with bottle, jug, jar and flask."

Thus, in Nissen the plaintiff sought to use "Rebound tumbling" instead of "trampoline," which had become a generic term to the public, and in American Thermos, the plaintiff sought to use the term "vacuum-insulated" for its trademark, "Thermos," which to the public had become a generic term. In both cases the plaintiff was unsuccessful in its attempt to make the substitution.

In the instant case we have a similar situation. The name "Yo-Yo" (or "yo-yo"), if not a generic term in the beginning (we have previously held that it was), became such in the minds of the public and, as previously shown, plaintiff itself did much to educate the public in this respect. Apparently in recognition

of the situation, sometime after 1955, plaintiff attempted, without success we think, to reclaim "Yo-Yo" from the public domain and substitute therefor "return top." In this effort it greatly accelerated its policing activities as well as its already expensive advertising. In 1962 and 1963, for instance, it spent $1,000,000 each year with various advertising media, and shortly thereafter the survey previously discussed was made in preparation for this litigation.

In conclusion, based on the record, which is consistent with common knowledge, we hold that the top in question is known and accepted by the general public by the name of "Yo-Yo" (or "yo-yo"). A court is not obligated to close its eyes and refuse to see or its mind and refuse to recognize that which is obvious to the public in general. The term "Yo-Yo" (or "yo-yo") is a descriptive term and not entitled to trademark protection. Thus, there is no occasion to consider the findings of the District Court or its conclusions of law as they relate to the infringement by defendants of this trademark.

█ This leaves for disposal the issue of infringement by defendants of plaintiff's trademark registration No. 685,-842, Butterfly, for return tops, issued September 29, 1959. It will be noted that this registration was allowed during the time plaintiff was attempting to substitute "return top" as a generic name for "Yo-Yo." No question is raised as to the validity of this trademark, so there is involved only the issue of infringement, to which only minor consideration was given, as revealed by the record and briefs in this Court. The evidence bearing on this issue is confusing, as was its consideration and treatment by the District Court.

The findings as they relate to this issue are:

> "Defendants have used, and are now using, Plaintiff's trademark Butterfly on goods not manufactured by Plaintiff, on packaging material therefor and on advertising and promotional literature.

> "Defendants have presented no credible evidence that they have not infringed Plaintiff's trademark Butterfly."

While the Court as a conclusion of law states that "Yo-Yo is valid and infringed," no conclusion is made as to Butterfly. Only in its judgment order does the Court recite that Butterfly is infringed.

All the toys bearing the trademark "Butterfly" sold by Royal were manufactured by and purchased from plaintiff. It is not claimed there was any infringement in this respect. Plaintiff furnished Royal its promotional literature in connection with these toys. Defendant Brown obtained from Royal these Butterfly toys which he sold to the public. Brown also obtained from other sources unmarked toys which he sold to the public. This in itself also did not constitute infringement. However, it is claimed that Brown in connection with his sale of unmarked tops used some of the promotional literature supplied by plaintiff, which described its Butterfly toys. On the other hand, there is evidence that the word "Butterfly" on the promotional sheets was blacked out and the word "Thunderbird" substituted therefor. We doubt if this confusing and meager bit of proof is sufficient to support a finding of infringement.

█ It is also doubtful that the Court's findings and conclusions on this issue are sufficient to support its judgment order. As noted, there is no finding or conclusion as to infringement. After finding that defendants used the trademark "Butterfly," the Court found that they had presented "no credible evidence that they have not infringed." Of course, the burden was on plaintiff to prove infringement, not on defendants to disprove it. It is not discernible whether the Court's reference in its judgment order to defendants' infringement of Butterfly was based on the meager proof offered by plaintiff or the failure of defendants to prove non-infringement. In view of this confused situation and taking into consideration the posture

which this facet of the case bears to the whole, it is our view and we so hold that the judgment order as it pertains to Butterfly cannot be sustained.

The judgment appealed from is reversed and the cause remanded for such further proceedings as may not be inconsistent with this opinion. Taxable costs of this appeal are to be shared equally by the parties.